1

2

3

4

5

6

7

8

9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10   URBANO MORALES ORTEGA,                    Case No. 1:16-cv-00235-DAD-EPG-HC

11                   Petitioner,              FINDINGS AND RECOMMENDATION
                                              RECOMMENDING DENIAL OF PETITION
12          v.                                FOR WRIT OF HABEAS CORPUS

13   RAYMOND MADDEN,

14                   Respondent.

15

16          Petitioner Urbano Morales Ortega is a state prisoner proceeding *pro se* with a petition for

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner raises the

18   following claims for relief: (1) the trial court's erroneous denial of the motion to suppress

19   Petitioner's statement; (2) the trial court's erroneous exclusion of third party culpability

20   evidence; (3) insufficient evidence to support the kidnapping conviction and special

21   circumstance finding; (4) insufficient evidence to support the mayhem and torture special

22   circumstance findings; (5) ineffective assistance of counsel; and (6) cumulative errors.

23          For the reasons discussed herein, the Court recommends denial of the petition for writ of

24   habeas corpus.

25                                           **I.**

26                                      **BACKGROUND**

27          On September 8, 2011, Petitioner was convicted by a jury in the Merced County Superior

28   Court of first-degree murder and aggravated kidnapping. The jury also found true the

1   kidnapping, mayhem, and torture special circumstances. (4 CT[1] 838–40). The trial court

2   sentenced Petitioner to life without the possibility of parole for the murder count and stayed the

3   sentence of life without the possibility of parole for the aggravated kidnapping count. People v.

4   Ortega, No. F063612, 2014 WL 7152494, at *1 (Cal. Ct. App. Dec. 16, 2014). On December 16,

5   2014, the California Court of Appeal, Fifth Appellate District affirmed the judgment and ordered

6   the superior court to prepare an amended abstract of judgment to correct a clerical error. Id. at

7   *28. The California Supreme Court denied Petitioner's petition for review on March 11, 2015.

8   (LD[2] 21, 22). Subsequently, Petitioner filed a petition for writ of habeas corpus in the California

9   Supreme Court, which denied the petition on September 23, 2015. (LDs 23, 24).

10      On February 19, 2016, Petitioner filed the instant federal petition for writ of habeas

11  corpus. (ECF No. 1). Respondent has filed an answer to the petition, and Petitioner has filed a

12  traverse. (ECF Nos. 13, 19).

13                                          **II.**

14                              **STATEMENT OF FACTS**[3]

15      The prosecution's main witness at trial was Luis Vazquez, an accomplice to the
        crime. In exchange for his truthful testimony, Vazquez was allowed to plead to
16      the lesser charge of kidnapping and first degree burglary. He was to receive a total
        term of nine years four months. He was still awaiting sentencing at the time of
17      trial.

18      Vazquez testified that on October 23, 2007, he was living with his family on
        Sycamore Street in Delhi. At the time, he was 18 years old and his friend Luis
19      Valencia, who was 24 years old, was also living at the home. The house was on
        the outskirts of town near some almond orchards.
20

21      At approximately 8:00 or 9:00 p.m. on the day in question, Vazquez was sitting
        on his porch when he observed Valencia drive up in an unfamiliar gray
22      (sometimes described as silver) Pontiac followed by Alvaro Reyes driving a red
        Lexus. Vazquez had met Reyes approximately four months earlier through
23      Valencia. Reyes and Valencia exited their cars and were having a discussion
        when Vazquez approached and overheard Valencia tell Reyes he "had to call and
24      pick her up." Vazquez asked what was going on and they replied, "'we got a little
        thing going on.'" Vazquez understood that they were going to do a favor for
25      Reyes.

26

27  [1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on June 23, 2016. (ECF No. 15).
    [2] "LD" refers to the documents lodged by Respondent on June 23, 2016. (ECF No. 15).
28  [3] The Court relies on the California Court of Appeal's December 16, 2014 opinion for this summary of the facts of
    the crime. See Vazquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

                                            2

Reyes left in the Lexus saying he had to get his truck, a light brown Ford F150 pickup truck. Meanwhile, Valencia told Vazquez "some Mexicans" took a pound of marijuana, and he was going to try to get it back. Vazquez offered to help Valencia because he knew Valencia had been assaulted in the past. He believed at the time that they were going to confront the person, who he later learned was the victim Rosa Avina, with guns in an attempt to get her to return the marijuana. If she did not have the drugs, they would beat her. Before leaving, Valencia retrieved his rifle and Vazquez retrieved some zip ties, tape, and a flashlight. Vazquez understood that Reyes was going to pick up Avina.

Valencia and Vazquez drove the Pontiac to a house on Clifford in Turlock. Vazquez was familiar with the house as he had been there before to drink and to smoke methamphetamine with Valencia and Reyes. He knew of two men who lived there named "Cheque" and "Mosca."

Upon arriving at the house, Vazquez retrieved some sheets from Cheque and covered the Pontiac at Valencia's request. Vazquez also retrieved a plastic gun, which looked real at night, from the trunk. Valencia armed himself with his rifle, while Vazquez had a two-by-four. Subsequently, Vazquez, Valencia, and Cheque congregated in a small tool shed so they would not be seen by Avina when she arrived. They smoked methamphetamine while they waited.

Reyes and Avina arrived in the truck, and the group in the tool shed could hear as the two entered the house. Shortly after they entered, Valencia, Vazquez, and Cheque approached the house with the weapons and flashlights. Vazquez noted it was dark outside and the house had no electricity. Valencia knocked on the door and then pushed it open when someone answered. The men stormed in and instructed everyone to get on the ground. When they entered, Valencia was armed with the rifle and Vazquez had the toy gun and the two-by-four.

There were three people inside the home on Clifford: Reyes, the victim, and Mosca. The victim was on the floor and her hands and feet were being bound by Valencia and Cheque. Additionally, her face was covered with the tape and Valencia was kicking her and telling her to be quiet. Meanwhile, Vazquez held the flashlight and ensured the others remained on the floor. He did this as "part of the show" so the victim would not know she had been set up. Vazquez bound Mosca with zip ties and took him to another room. He returned for Reyes and began pushing him, when Reyes crawled to the other room on his own. Once in the room, Vazquez told Reyes to stay there, but did not restrain him in any way.

While in the house, Valencia took a ring from the victim as well as a small amount of methamphetamine and some papers. Vazquez noted the papers had some kind of police agency or hotline number on them. He relayed this information to Valencia. Valencia asked Vazquez to question the victim about the missing marijuana because Vazquez spoke English. He did so, and the victim replied "Martha." Valencia told Vazquez to move the Pontiac closer to the door. As Reyes's truck was in the way, Vazquez asked Reyes for his keys. Reyes provided them and Vazquez moved both the truck and the gray Pontiac, backing the Pontiac close to the door. Apparently not satisfied with the location of the Pontiac, Valencia took the keys and moved the car even closer to the house and opened the trunk. Then the three men carried the victim to the trunk of the Pontiac. Valencia closed the trunk, told Vazquez to get into the back seat and lie down, and drove back to their Sycamore Street house.

3

Upon arriving at the Sycamore house, Valencia told Vazquez to take the rifle back into the house. Approximately five minutes later, Reyes arrived in his truck and got into the Pontiac with Valencia; Reyes told Vazquez he would be right back. The two returned in the Pontiac 15 to 20 minutes later accompanied by Omar Cebrero and defendant. All four men were in the Pontiac. Vazquez explained he had not met either Cebrero or defendant prior to the day in question.

Once they arrived, Valencia, defendant, and Reyes exited the car and stood in a field talking. Cebrero hesitated, only exiting the car partway, but joined the group after Valencia said something to him. Vazquez could not hear what Valencia said, but noted Valencia never pointed a weapon at Cebrero, and to his knowledge Valencia did not have a weapon with him. After approximately one minute, Vazquez approached the group and asked for a cigarette. Valencia told the others how Vazquez had helped at the Clifford house. Defendant said it was "kind of bad" the marijuana was not recovered. Vazquez noted defendant was doing most of the talking. Based on the situation, Vazquez assumed defendant and Cebrero were the drug dealers who owned the missing marijuana.

During the conversation, Vazquez explained the victim just kept telling them "Martha" but they did not find the marijuana, and it was up to the others to decide what to do with the victim. After a while, Valencia said "'I know what to do'" and instructed Vazquez to get him a bottle. Vazquez retrieved a small plastic soda bottle and brought it to Valencia, who filled it with gasoline. When Valencia returned holding the bottle filled with gasoline, he spoke to Cebrero and defendant for approximately 30 seconds and then began walking toward the Pontiac. Defendant joined Valencia, but Cebrero again hesitated. Noticing this, Valencia went back and said something to Cebrero and grabbed him by the sleeve; Cebrero then joined the men in the Pontiac and they left.

Vazquez noted he never heard anyone say they should stop or protest in any way, even after Valencia retrieved the gasoline. He explained he never saw Valencia threaten Cebrero or raise his voice although he spoke loudly. Valencia seemed irritated when speaking to Cebrero, although Vazquez explained Valencia seemed irritated throughout the night. Vazquez never saw Valencia with any weapons when the men were talking in the field.

Vazquez explained Reyes had left the group and went to his truck sometime before Valencia obtained the bottle filled with gasoline. Vazquez joined Reyes in his truck when Valencia was talking to defendant and Cebrero while holding the gas-filled bottle. Vazquez and Reyes smoked methamphetamine in the truck as Valencia and the others left in the Pontiac.

The Pontiac returned five to ten minutes later. Valencia exited the car, said something to the passengers, then one of the passengers got into the driver's seat and drove off. Valencia joined Reyes and Vazquez in the truck and the men smoked methamphetamine together. Sometime later, a woman Vazquez knew as Mayra walked up and joined them in the truck. The four later went to the Clifford house where they continued to smoke methamphetamine. At the house, Vazquez apologized to Mosca for tying him up. To Vazquez's knowledge the marijuana was never recovered.

Vazquez's recorded interview with the police was played for the jury. He made several statements to the detectives and in prior testimony that were inconsistent with his trial testimony. Vazquez testified he had lied to the police about a number of facts because he was trying to protect his friends.

4

At the time of the crime, Reyes was 28, Valencia was 24, Cebrero was 18 and defendant was 27 years old.

During that time period, Vazquez was using about a gram of methamphetamine a day and had been awake for two days prior to the kidnapping.

Jesus Cruz testified that on the morning of October 23 he met with the victim so she could sell a ring for him. The two were in Livingston and at one point went to a house with a fountain in front of it and a gray Pontiac parked in the garage. Cruz recalled two men who went by the nicknames "Tornillo" and "Gato" gave them a ride from Livingston to a house in Turlock in the gray Pontiac. Upon arriving at their destination, the victim got into a brief verbal dispute with one of the men before the men left. Shortly thereafter, Cruz saw the victim with a pound of marijuana. Although he denied it at trial, Cruz had previously told a sheriff's deputy in a prior interview that he had seen the marijuana in the trunk of the Pontiac on the day in question. Cruz never saw the men again. Cruz and the victim proceeded to walk around Turlock, going to a few different houses, and then returned to the home where they had been dropped off. At the home, they smoked methamphetamine with several other people.

Later that evening the victim said she was going to the store and was picked up by a Hispanic male driving a brown Ford F150 truck. The victim briefly argued with the driver but ultimately left with him. Cruz attempted to go with her, but she told him to stay there. He recalled he had tried to open the door to the truck, but it was locked by the driver. Cruz never saw the victim again.

On the morning of October 24, Merced Sheriff's Deputy Frank Swiggart responded to the report of a person in some bushes in a rural area of Merced County. When he arrived, he discovered the victim severely burned and with her arms and legs bound. She had plastic wrapped around her head. The victim asked several times whether she was alive.

Detective Charles Hale was notified regarding the discovery and responded to the scene. He observed the victim had skin hanging from her body due to the burns, blisters oozing a white substance, and foam coming from her mouth. She appeared to be in extreme pain. Hale only briefly interviewed the victim due to her condition. The interview was recorded and played for the jury.

The victim told Hale she had been picked up by a man named Alvaro, who was driving a gold truck, and he took her to a house in Turlock. She further relayed that while at the house someone knocked, then men barged into the house with guns, tied her up, and put tape on her face. She did not know who had done this to her. Hale observed the victim's face was covered with tape. There was a distinctive pattern on the tape.

After interviewing the victim, Hale discovered the area where the victim was burned, which was approximately seven-tenths of a mile away in a nearby orchard. At the scene, deputies located a boat that was still smoldering, a plastic soda bottle that smelled of gasoline, and shoe prints. The shoe prints were photographed for comparison. He subsequently observed similar shoe prints at the Sycamore Street residence.

Detective Corey Gibson testified that after learning from the victim she had been picked up by Reyes, officers conducted surveillance on Reyes's home. Reyes was contacted and interviewed by detectives. They learned he owned a brown Ford

F150 pickup truck. Reyes took the detectives to the location where he had picked up the victim on the night of the kidnapping. He also directed officers to the Sycamore Street house and pointed out Valencia. Valencia was arrested at the Sycamore house. The Sycamore house is approximately four and one-half miles from the location where the victim was burned.

The following day, Reyes also directed officers to the Clifford house. Additionally, Reyes directed the detectives to Cebrero's home on Hammatt Avenue in Livingston, explaining Cebrero was "responsible for" the victim's death. The home had a fountain in front and a silver Pontiac parked outside. The car was registered to Cebrero. The car was later processed for fingerprints and the only identifiable print found belonged to Cebrero. The fingerprint analyst noted the car was "extremely clean." Blood was found in the trunk of the Pontiac. Genetic testing on the blood revealed the blood belonged to the victim. Ronolfo "Tornillo" Ortega, defendant's brother, also lived there. Reyes lived approximately one and one-half blocks from Cebrero.

On October 27, Hale assisted in the service of a search warrant at the Clifford house in Turlock. Officers discovered zip ties and the same distinctive tape used on the victim. A search warrant was served on the Sycamore home on October 26. There officers found a loaded rifle, and a handle with tape matching the distinctive tape used on the victim. On November 2, officers searched defendant's home and seized a total of three shoes.

The victim died on October 26 as a result of multiple system failure caused by her extensive thermal burns. Dr. Robert Lawrence, the pathologist who performed the autopsy, noted the victim had a pattern of burns on her body consistent with her being splashed with an accelerant. The burns covered approximately 60 percent of her body and were focused on the front and back of her upper body. The victim also had burns in her airway, indicating she had inhaled flames. He described her injuries as "excruciatingly painful" and resulted in the loss of 60 percent of her skin. Had she survived, she would have been permanently disfigured. At the time she was admitted to the hospital, the victim had toxic levels of methamphetamine in her system.

Items of evidence, such as pieces of recovered tape and the plastic bottle, were processed for prints, however, none of the suspects' fingerprints was found. Testing of the victim's clothing revealed traces of gasoline.

After Valencia's arrest, officers monitored jail calls between Valencia and his wife. During one of the calls, Valencia told his wife he had dropped a ring and buried it when he was arrested. In another call, Valencia's wife indicated someone was able to recover the ring. Officers later contacted Valencia's wife and seized the ring. Both Jesus Cruz and Vazquez identified the ring as the one taken from the victim.

Merced Sheriff's Deputy Raymond Framstad testified as an expert regarding marijuana. He noted a pound of marijuana was worth between $600 and $1,000 in 2007. However, if the marijuana was a type having a high THC (tetrahydrocannabinol) content, it could be worth up to $6,000 a pound. A person dealing in marijuana is likely to have some indicia of the business such as pay/owe sheets or large amounts of money. Framstad described "mules" as persons who transport drugs for someone else. They are typically paid for their services.

Detective Alex Barba learned through the course of investigating this case that several suspects were known by nicknames. Specifically, he learned Cebrero used the nickname "Gato," Valencia used the nickname "Primo," and defendant used the names "Oaxaco" and "Juan."

Defendant was interviewed on November 2. Barba testified that during the interview defendant identified Reyes, Valencia, and Cebrero in separate photographic lineups.

After being informed the detectives had already spoken to numerous people involved, knew what happened, and had made several arrests, defendant asked the detectives who specifically had been arrested. Defendant then proceeded to deny he had any involvement in the victim's death and that he had only heard about it from others. After the detectives confronted him with the fact they already knew he was present when the victim was killed, defendant stated that Cebrero had called him on the day of the murder and informed him the victim had stolen a pound of marijuana and a half ounce of crystal methamphetamine. Cebrero asked defendant if he knew someone who could help get his drugs back. Defendant told Cebrero to think carefully because this is not a "game," but Cebrero said the victim had stolen from him too many times. Defendant then called Reyes, telling him Cebrero needed help in getting his drugs back. Reyes said he would call someone and defendant believed Reyes called Valencia, but defendant explained he did not know him. Although defendant admitted calling Reyes for Cebrero, he denied knowing the victim would be killed, saying the plan never was to kill her.

Defendant said he later gave Reyes's phone number to Cebrero so the two could communicate directly. He explained he told Cebrero, "'I'll give you the number, and I don't know anything, it's between you two.'" Sometime later, Reyes called Cebrero back and said everything was ready, and the victim did not have his drugs. At this point Reyes and Valencia had already abducted the victim. Defendant explained he and Cebrero were still in Livingston, and they were not involved in kidnapping the victim.

Defendant informed the detectives that Cebrero had loaned Reyes his car earlier in the afternoon after the two had already devised a plan. He was unsure of how exactly Reyes had retrieved the car because he claimed he had left to do something, but had returned to Cebrero's home before Reyes called. When he returned, he noted Cebrero's car was gone. Defendant told the detectives that Cebrero had never let defendant borrow the car. Defendant claimed he was afraid for his family because he was threatened.

Defendant explained he was at the home in Livingston with Cebrero when Cebrero received the call telling him Reyes and Valencia had the victim. Defendant told Cebrero, "'If she doesn't have your stuff, well, too bad . . . let her go.'" Cebrero replied that the victim had done this too often. Valencia and Reyes brought the victim to the "Westside." Cebrero and defendant went to the location to meet Reyes and Valencia. When they arrived, the victim was already in the trunk of the car. Valencia was driving the car. While on the Westside, Valencia opened the trunk and interrogated the victim regarding the location of the drugs. The victim replied "Martha." Defendant claimed he did not hear much of the questioning because he stayed near the front of the car.

According to defendant, Valencia made the plans regarding kidnapping the victim, but once they had the victim, it was Cebrero's decision to kill her. Cebrero said it would be better to kill her. Defendant did not know where Reyes and

Valencia had abducted the victim from as he was not present for the kidnapping. After meeting Valencia and Reyes, both Cebrero and defendant joined the others in the Pontiac.

The men went to Valencia's home, where they dropped off Reyes. The victim was still in the trunk. Cebrero obtained the gas at Valencia's house after they dropped off Reyes, and Cebrero brought it with them to the field. Defendant recalled Valencia poured some gas into a small plastic bottle and Cebrero took it with them in the car. Cebrero wore white cloth gloves.

The men then went to Delhi to a field. After they had dropped off Reyes, Valencia was in the car with Cebrero and defendant. Defendant was in the back seat. Cebrero said they should kill the victim and Valencia told Cebrero to make the decision. Valencia continued driving towards Ballico, the area where the victim was burned. The victim was still in the trunk. According to defendant, Cebrero was giving the orders and Valencia was following them.

After they arrived at the field where the victim was ultimately burned, defendant claimed he stayed in the car because he did not want to watch. Meanwhile, Cebrero and Valencia removed the victim from the trunk and lit her on fire. Defendant claimed he did not know who had lit the fire because he remained inside the car and did not turn to look. After the detectives informed defendant they already knew defendant had lit the fire, defendant admitted Cebrero and Valencia removed the victim from the trunk, placed her in the boat in the field, and either Valencia or Cebrero threw the gas on her and he lit her on fire. He claimed he only lit the victim on fire because Cebrero and Valencia were unable to do so. He used a lighter from his pocket to light a small stick on fire and threw the stick on the victim. Before he lit the victim on fire, she was screaming that she would give back the drugs. The victim continued screaming after she was set on fire, and she jumped out of the boat. Defendant admitted the victim suffered when she was set on fire. She should not have had to pay with her life for taking the drugs. He continued to assert throughout the interview that it was Cebrero's idea to set the victim on fire.

Defendant admitted he made two mistakes: putting Reyes in touch with Cebrero and setting the victim on fire. Defendant said no one had a gun that night and no shots were fired. Defendant recalled he heard Cebrero say he would pay Valencia $600 and Reyes $300.

Defendant thought the missing marijuana belonged both to his brother Tornillo and Cebrero.

Ortega, 2014 WL 7152494, at *1–7 (footnotes omitted).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed

1  by the United States Constitution. The challenged convictions arise out of the Merced County

2  Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a);

3  28 U.S.C. § 2241(d).

4  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

5  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

6  enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

7  Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is

8  therefore governed by its provisions.

9  Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

10 barred unless a petitioner can show that the state court's adjudication of his claim:

11
    > (1) resulted in a decision that was contrary to, or involved an
12  > unreasonable application of, clearly established Federal law, as
    > determined by the Supreme Court of the United States; or
13  > (2) resulted in a decision that was based on an unreasonable
    > determination of the facts in light of the evidence presented in the
14  > State court proceeding.

15 28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562

16 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been

17 "adjudicated on the merits" in state court, the "AEDPA's highly deferential standards" apply.

18 Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the

19 claim is reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009).

20 In ascertaining what is "clearly established Federal law," this Court must look to the

21 "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

22 relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

23 decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that

24 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent

25 decisions"; otherwise, there is no clearly established Federal law for purposes of review under

26 AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742,

27 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125,

28 123 (2008)).

1    If the Court determines there is clearly established Federal law governing the issue, the
2    Court then must consider whether the state court's decision was "contrary to, or involved an
3    unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A
4    state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at
5    a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state
6    court decides a case differently than [the Supreme Court] has on a set of materially
7    indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an
8    unreasonable application of[] clearly established Federal law" if "there is no possibility
9    fairminded jurists could disagree that the state court's decision conflicts with [the Supreme
10   Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state
11   court's ruling on the claim being presented in federal court was so lacking in justification that
12   there was an error well understood and comprehended in existing law beyond any possibility for
13   fairminded disagreement." Id. at 103.

14   If the Court determines that the state court decision was "contrary to, or involved an
15   unreasonable application of, clearly established Federal law," and the error is not structural,
16   habeas relief is nonetheless unavailable unless it is established that the error "had substantial and
17   injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)
18   (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776
19   (1946)).

20   The AEDPA requires considerable deference to the state courts. The Court looks to the
21   last reasoned state court decision as the basis for the state court judgment. See Brumfield v. Cain,
22   135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst v.
23   Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state
24   court and the state court has denied relief, it may be presumed that the state court adjudicated the
25   claim on the merits in the absence of any indication or state-law procedural principles to the
26   contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but
27   provides no reasoning to support its conclusion, a federal habeas court independently reviews the
28   record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel,

709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

**IV.**

**REVIEW OF CLAIMS**

**A.  Denial of Motion to Suppress**

In his first claim for relief, Petitioner asserts that the denial of the motion to suppress his pretrial statements violated his rights under the Fifth and Fourteenth Amendments because Petitioner was not properly advised pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and he did not make a knowing and intelligent waiver. (ECF No. 1 at 5).[4] Respondent argues that the state court's rejection of the Miranda claim was reasonable. (ECF No. 13 at 22).

Petitioner raised his Miranda claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's Miranda claim, the California Court of Appeal stated:

**I. Defendant's Statement Was Properly Admitted**
Defendant contends his statement should have been suppressed due to the officer's misadvisement of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda* ). Specifically, he argues that due to grammatical errors in the advisement as well as his poor understanding of Spanish, he was not properly advised of his right to appointed counsel at no cost to him. Because he was not

---

[4] Page numbers refer to the ECF page numbers stamped at the top of the page.

adequately advised of his rights, his waiver could not be considered knowing, intelligent and voluntary. We conclude defendant's statement was properly admitted.

### Evidence Adduced At The Hearing

Barba testified he assisted in the homicide investigation and conducted an interview with defendant. Barba speaks Spanish, so he was able to translate during the interview. The audio recording and the transcript were made available to the court, and the parties stipulated the court could consider them during the hearing.

After getting some preliminary information, Barba read defendant his *Miranda* warnings from a standard card with the *Miranda* warnings written in English. He translated them from English to Spanish. In his opinion, the word "sus" could mean "your" or "their." He testified he never specifically asked defendant if he understood the rights or gave them up.

Barba explained defendant was able to converse with him in Spanish without difficulty. Defendant's answers were logical to the questions posed and he did not have any problems understanding defendant.

Certified Spanish Interpreter Janet Trujillo testified she reviewed the video recording as well as the transcripts of defendant's interview. In her opinion, the translation of what Barba told defendant regarding the right to counsel was "if you don't have ... [y]ou can pay an attorney ... and [t]hen the County will pay." In her opinion the statement the officer made in Spanish meant the county would reimburse him for an attorney if he could not pay rather than explaining he could have an attorney free of charge. Additionally, after he made that statement, the officer asked whether defendant understood "their" rights instead of understanding "your" rights. The interpreter admitted the Spanish word for "reimburse" was not used. The interpreter testified defendant was fluent in Spanish.

Dolores Espinosa is a counselor at Merced High School. Espinosa administered a test to defendant to evaluate his proficiency in oral language skills in Spanish. After administering the test, Espinosa determined defendant scored at the second to the lowest level of proficiency.

Espinosa explained defendant was able to answer the questions when he understood them. As the test progressed, however, she noticed defendant could not answer when she used academic language. In those instances, he did not appear to understand the question. When defendant did not understand, he attempted to seek clarification of some of the questions; however, the test did not allow the examiner to provide additional clarification. Instead, Espinosa would merely repeat the question. Defendant was unable to answer. For example, defendant was told to answer in complete sentences. He was unable to do so, instead answering the question only with a noun.

Espinosa noted defendant appeared to have difficulty with abstract concepts and academic language. It appeared to Espinosa that defendant was making an effort on the test. During the examination Espinosa learned defendant had only two years of formal education in Mexico and no education within the United States.

According to the test results, defendant would be classified as a non-Spanish speaker. But Espinosa agreed defendant was in fact fluent in Spanish. Espinosa

agreed the test she employed was for academic placement and, according to the test, defendant had failed to learn particular terminology.

Clifford Hazeltine, a private investigator, testified he observed defendant as he took the test and he appeared to be giving a genuine effort.

Defense counsel argued that under the totality of the circumstances and due to defendant's lack of understanding of Spanish, his waiver was not knowing, intelligent, and voluntary.

### *The Trial Court's Ruling*

The trial court issued a lengthy written ruling on the issue, ultimately finding the advisements given reasonably conveyed to defendant his rights pursuant to *Miranda.* The court specifically found defendant was a fluent Spanish speaker and did not appear to have any difficulty comprehending or answering the questions posed to him. Regarding the right to have an attorney appointed at no charge, the court found the translation of Barba's statement was as follows: "If you don't have, you can pay an attorney then the county will pay an attorney so he can represent you before I ask you any question. Do you understand your rights?" Defendant nodded his head, indicating his agreement.

The court further found the test administered to defendant was designed specifically for academic placement, and it did not measure the level of defendant's comprehension of his *Miranda* rights. Rather, the video of the interview itself, which demonstrated defendant's demeanor, was a more accurate indicator of his ability to understand Spanish, which was his native language.

During the interview, defendant demonstrated his ability to understand and answer questions. He did not show any signs of being mentally challenged or delayed. The court gave "weighted consideration" to the testimony regarding his number of years of formal education, as well as to his prior experience with the criminal justice system.

The court accepted the translation of the right to have appointed counsel as follows: "If you don't have, you can pay an attorney then the County will pay an attorney so he can represent you before I ask you any question." Although the court found the "advisement is awkward, ungrammatical, and slightly confusing, it adequately informed defendant ... that he could pay an attorney *or the county could pay an attorney to represent him before questioning begins.*" (Italics in original.) Taken as a whole, the court found the advisement reasonably conveyed the right to have an attorney appointed if defendant could not afford one. Additionally the court determined there was no coercion present in the interview.

### *Analysis*

Pursuant to *Miranda,* a suspect must be advised of the right to remain silent, that any statement may be used against him or her, the right to the presence of an attorney during questioning, and the right to have an attorney appointed for him or her prior to questioning if the suspect cannot afford an attorney. (*Miranda, supra,* 384 U.S. at pp. 478–479.) However, the "prophylactic *Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.' " (*Duckworth v. Eagan* (1989) 492 U.S. 195, 203.) Therefore, reviewing courts "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement." (*Ibid.*) Rather, the "inquiry is simply whether the warnings

reasonably 'convey to [a suspect] his rights as required by *Miranda.*' " (*Ibid.,* quoting *California v. Prysock* (1981) 453 U.S. 355, 361.)

Before a defendant's statement made during a custodial interrogation may be admitted, the prosecution must demonstrate the defendant was advised of and waived his or her rights pursuant to *Miranda.* (*Miranda, supra,* 384 U.S. at pp. 478–479.) To be valid, a waiver must be both knowing and voluntary, that is, the waiver must be made with a full awareness of the rights being abandoned by the consequence of that decision. (*People v. Whitson* (1998) 17 Cal.4th 229, 248–249.) The prosecution bears the burden of demonstrating a valid waiver by a preponderance of the evidence. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1034.) We consider the totality of the circumstances in determining whether a defendant has validly waived his or her *Miranda* rights. (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

In reviewing the trial court's finding that defendant knowingly and voluntarily waived his *Miranda* rights, we accept the trial court's finding of fact and credibility determinations where supported by substantial evidence. (*People v. Whitson, supra,* 17 Cal.4th at pp. 247–248.) We independently determine whether the challenged statement was illegally obtained (*People v. Bradford, supra,* 14 Cal.4th at p. 1033), and we "may 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." (*People v. Jennings* (1988) 46 Cal.3d 963, 979.)

When examining the totality of the circumstances surrounding a *Miranda* waiver, the court may take into account, among other factors, the "background, experience and conduct of the accused." (*People v. Davis* (2009) 46 Cal.4th 539, 586.) Specifically, the court may also consider a defendant's language abilities in determining whether there was a valid waiver. (See, e.g., *United States v. Bernard S.* (9th Cir.1986) 795 F.2d 749, 751, disapproved on other grounds in *U.S. v. Dozier* (9th Cir.1988) 844 F.2d 701, 706; *United States v. Heredia–Fernandez* (9th Cir.1985) 756 F.2d 1412, 1415; *United States v. Martinez* (9th Cir.1978) 588 F.2d 1227, 1235.)

"Although language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated." (*U.S. v. Hernandez* (10th Cir.1990) 913 F.2d 1506, 1510.) " '[The] translation of a suspect's *Miranda* rights need not be perfect if the defendant understands that he or she need not speak to the police, that any statement made may be used against him or her, that he or she has a right to an attorney, and that an attorney will be appointed if he or she cannot afford one.' " (*U.S. v. Perez–Lopez* (9th Cir.2003) 348 F.3d 839, 848–849, italics omitted.) No specific wording need be used to give the *Miranda* warning, so long as the warning reasonably conveys to the suspect his or her *Miranda* rights. (*California v. Prysock, supra,* 453 U.S. at p. 359; *Duckworth v. Eagan, supra,* 492 U.S. at p. 202.)

A translation of a suspect's *Miranda* rights into the language spoken by the suspect need not be perfect so long as the suspect understands the meaning of the rights. (*U.S. v. Hernandez* (10th Cir.1996) 93 F.3d 1493, 1502.) The main inquiry is whether the translated warnings reasonably conveyed to the individual his or her *Miranda* rights. (*Duckworth v. Eagan, supra,* 492 U.S. at p. 203.) For example, in *Hernandez,* the Spanish-speaking defendant was given an imperfect translation of her *Miranda* warnings. She was advised she "had the right to remain

silent, that anything she said may be to her detriment and could be used against her 'according to the law,' that she had the right to 'contract' an attorney before and during questioning, that an attorney would be provided if she could not afford one, and that she had the right to change her mind and not answer any questions." (*Id.* at p. 1497.) Although the translation was imperfect, it was sufficient to convey the substance of the rights and, therefore, adequate. (*Id.* at p. 1502.)

Likewise, in *Duckworth,* the defendant was advised, inter alia, that " '*[y]ou have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.* You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.' " (*Duckworth v. Eagan, supra,* 492 U.S. at p. 198.)

The court found "inclusion of [the] 'if and when you go to court' language" in the *Miranda* warnings was not improper, first, because it accurately described the procedure for the appointment of counsel in the state in which the crime took place and, second, because "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one.... If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel. [Citation.] Here, [the defendant] did just that." (*Duckworth v. Eagan, supra,* 492 U.S. at pp. 203–204, fn. omitted.)

The court distinguished the warnings given in *Duckworth* from "the vice referred to in *California v. Prysock* [, which] was that such warnings would not apprise the accused of his right to have an attorney present if he chose to answer questions. The warnings in this case did not suffer from that defect. Of the eight sentences in the initial warnings, one described [the defendant's] right to counsel 'before [the police] ask[ed] [him] questions,' while another stated his right to 'stop answering at any time until [he] talk[ed] to a lawyer.' [Citation.] We hold that the initial warnings given to [the defendant], in their totality, satisfied *Miranda.*" (*Duckworth v. Eagan, supra,* 429 U.S. at p. 205.)

*U.S. v. Perez–Lopez, supra,* 348 F.3d 839, upon which defendant relies, stands in contrast to the above cases. There, the non-English-speaking defendant was provided *Miranda* warnings in Spanish. The defendant argued that the translation of the warning was flawed, resulting in an uninformed waiver of his rights. Testimony established that regarding the right to counsel, the defendant was advised as follows: " '[Y]ou have the right to solicit the court for an attorney if you have no funds.' " (*U.S. v. Perez–Lopez, supra,* at p. 847.) The Ninth Circuit Court of Appeals held the warning was inadequate as it implied the defendant could be denied an attorney. By using the word "solicit," the phrase implied a possibility of rejection. Because the warning did not convey "the government's *obligation* to appoint an attorney" for someone who was indigent, the warning was fatally flawed. (*Id.* at p. 848.)

Unlike *U.S. v. Perez–Lopez,* nothing in the advisement here implied defendant could be denied an attorney. Rather the case is more analogous to the facts present in *United States v. Soria–Garcia* (10th Cir.1991) 947 F.2d 900. The defendant there spoke only Spanish and the officer translated the warnings into Spanish.

According to the testimony at the hearing, the officer informed the defendant that if he did not " 'have the money to employ a lawyer one will be appointed to you before answering any questions, if you so decide.' " (*Id.* at p. 901, italics omitted.) The district court had an interpreter translate the warnings given. According to that translation, the warning stated, " 'If you do not have the money to employ an attorney, one can be obtained for you before we ask you any questions, if you so desire.' " (*Ibid.*)

The trial court suppressed the statements, explaining the rights as given did not convey that the defendant could have an attorney appointed to him at no cost. The Tenth Circuit Court of Appeals disagreed, explaining that under either translation, the "thrust of the warning" conveyed the defendant would be afforded an attorney if he did not have the money to employ one on his own. (*United States v. Soria–Garcia, supra,* 947 F.2d at p. 902.) The court rejected the "suggestion that the warning, as given, left open the possibility that [the defendant] would be 'billed later.' " (*Ibid.*)

Likewise here, the implication was not that defendant would be required to pay for an attorney on his own and then subsequently be reimbursed. Rather, the warning explained he could pay for an attorney or the county would pay for an attorney for him. There was no implication defendant would be billed later for the attorney. Indeed, the translated statement specifically stated the county "will pay an attorney." The fact that the warning referenced the county would pay the attorney dispelled any notion defendant would have to pay first and seek reimbursement later.

Applying the above principles, we conclude substantial evidence supports the trial court's findings. The trial court specifically accepted Trujillo's translation of the right as read to defendant. The evidence supported the trial court's findings that the warnings, taken as a whole, reasonably conveyed defendant's *Miranda* rights. Although Trujillo testified that the translation of the statement meant the county would reimburse defendant if he could not afford an attorney, she admitted the word reimburse was never used. The court could rely upon the translated sentence itself to determine whether it adequately conveyed the right; it was not required to accept Trujillo's interpretation of the meaning of the sentence.

Barba explained defendant had the right to remain silent, that anything he said could be used against him in court, and that he had a right to have an attorney before and during questioning. Immediately following these rights, Barba advised defendant, " 'If you don't have, you can pay an attorney then the County will pay an attorney so he can represent you before I ask you any question.' " Taken in context, this advisement, although grammatically flawed, conveyed defendant's right to have court-appointed counsel. The language was not so ambiguous or confusing as to lead defendant to believe he would be required to obtain an attorney on his own and then be reimbursed later. Rather, the advisement first referred to not having something then immediately referenced paying an attorney, and then was immediately followed by the statement that the county would pay an attorney. The sentence specifically stated that "the County will pay an attorney so he can represent" defendant. Notably, the statement advised defendant the County would pay "an attorney," not pay defendant after the attorney was hired.

The prophylactic *Miranda* warnings are not required to be conveyed in any particular form or "talismanic incantation." (*California v. Prysock, supra,* 453 U.S. at p. 359.) Even if the grammatically flawed sentence imperfectly conveyed the idea of the county providing an attorney for defendant in the context of the

right to have an attorney during questioning, the inability of defendant to pay for one, and the idea that the county would pay for an attorney, it sufficiently conveyed the concept of appointment. Considering the entirety of the warnings, it appears to relay the concept that if defendant did not have any money to pay an attorney, the county would pay for an attorney. This is all that is required.

Defendant also focuses on the question following the advisement of rights asking whether he understood the rights. According to Trujillo, Barba asked defendant if he understood "their" rights. Evidence at the hearing established that because Barba used the informal form of the verb, the question could mean "do you understand *your* rights" or "do you understand *their* rights." In context, however, it is apparent Barba was explaining defendant's rights to him. Indeed, Barba began the admonishment by saying "I'm going to talk to you, you have some rights. Right now I'm going to read to you your rights." After the advisement of each right, Barba asked defendant if he understood. Taken in context, then, the final question asking if he understood the rights related to his rights as well, even if the statement could also be interpreted to understanding someone else's rights. In context it was clear the rights all related to defendant. We agree with this interpretation: that the advisements reasonably relayed defendant's *Miranda* rights and asked if he understood.

In arguing the trial court's ruling was erroneous, defendant further alleges the trial court "disregarded undisputed evidence regarding [defendant']s ability to understand and communicate in Spanish." He also contends the court "disregarded background information Espinoza [*sic*] received from [defendant] regarding his educational background, deeming it unreliable hearsay." Not so.

It is true that in determining whether there is a valid waiver of rights, the court considers the totality of the circumstances, including the background, experience, and conduct of the defendant. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269.) This includes taking into account the defendant's language difficulties. (See, e.g., *United States v. Bernard S., supra,* 795 F.2d at p. 751; *United States v. Heredia–Fernandez, supra,* 756 F.2d at p. 1415; *United States v. Martinez, supra,* 588 F.2d at p. 1235.) Defendant claims the trial court did not give these factors due consideration. We disagree.

There was conflicting evidence regarding defendant's ability to understand and communicate in Spanish. While Espinosa testified that, pursuant to her testing, defendant would be classified as a non-Spanish speaker, the evidence demonstrated defendant was indeed fluent in Spanish. Barba testified he questioned defendant in Spanish, and defendant was able to answer the questions appropriately in Spanish. Even Espinosa conceded defendant was fluent in Spanish. Furthermore, the video of the interview confirms defendant was able to understand and express himself in Spanish, which appears to be his native tongue.

Defendant seems to take issue with the fact the court gave the testing performed by Espinosa little weight, finding the test was not "an accurate measure of defendant's comprehension of Detective Barba's Spanish recitation of the *Miranda* warnings." Instead, the court found the recording of the "interrogation, which shows his demeanor, body language and captures his spoken words is a better and more concrete indication of [defendant]'s ability to comprehend and communicate in Spanish with Detective Barba than the results of the test administered by Ms. Espinoza [*sic*]." We find the trial court's findings supported by the evidence.

17

The testing revealed defendant had difficulty with certain academic terms and abstract concepts. But Espinosa also testified defendant was able to communicate to her when he needed clarification of a question. This demonstrates defendant was able to communicate in Spanish and to seek clarification when he did not understand a word used. The test Espinosa administered was directed at a person's academic proficiency in Spanish. However, the discussion between Barba and defendant did not take place in an academic setting. Defendant is obviously fluent in Spanish and in no way demonstrated any lack of understanding either through his body language or by asking any questions. Rather, as the trial court found, he held eye contact with Barba when he was informed of his rights and nodded in agreement when asked if he understood. The trial court was entitled to find that defendant's comprehension of Spanish was more accurately relayed in the interview than through the academic test.

The issue before the court was whether defendant understood his rights. The fact defendant obviously speaks Spanish, the wording of the translated rights, and the fact defendant nodded after being asked if he understood, and the fact that he did not ask any questions demonstrating a lack of understanding of his rights, all support the trial court's conclusion defendant understood his rights.

Defendant argues the court refused to consider the fact he could not read or write as demonstrated on the video. However, nothing in the trial court's ruling supports such a conclusion. The issue before the court had little to do with defendant's literacy as his rights were explained to him orally. Defendant was never asked to read the rights to himself. As we have previously explained, the evidence presented supported the trial court's ruling that Barba relayed defendant's right to counsel free of charge, and its further finding that defendant understood and voluntarily waived his rights.

Furthermore, we reject defendant's assertion that the trial court disregarded information regarding defendant's educational background, deeming it unreliable hearsay. Nothing in the ruling compels this conclusion. Rather, the trial court simply explained it did not make any factual findings as to defendant's education level as the only evidence before the court on the issue was hearsay. There was nothing improper with the court's evaluation of the evidence. While an expert may consider reliable hearsay in forming an opinion, and may be permitted at times to relay the substance of the hearsay to the trier of fact to evaluate the credibility of the opinion itself, the underlying hearsay is not itself admissible for the truth of the matter asserted. (Evid.Code, §§ 801, subd. (b), 802; *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619.) By taking note of the context and the overall evidence, the court simply seemed to be relaying this principle. The court explained in its ruling that the test results labeled defendant as a non-Spanish speaker, which was clearly in conflict with the video recording of his statements showing defendant fluent in Spanish. The court decided to not make any factual finding regarding defendant's educational background, but expressly gave the evidence "weighted consideration."

Considering in their totality the advisements given in this case, defendant was clearly advised of his right to remain silent, the consequences of forgoing that right, and his right to have an attorney present during questioning. The challenged warning, while not a verbatim Spanish translation of the language used in *Miranda,* was sufficient to accomplish what the United States Supreme Court stated as its purpose, namely, to prevent a misunderstanding that the right to consult a lawyer is conditioned upon having the funds to obtain one. (See *Miranda, supra,* 384 U.S. 436.) Defendant was effectively advised that if he

18

wanted a lawyer and could not afford one, the county would pay for one. Considered in their entirety, the warnings given defendant do not imply defendant would be billed for an attorney or he would be required to pay for an attorney only to be reimbursed later. Consequently, the trial court's ruling denying the motion to suppress the statement was not in error.

Ortega, 2014 WL 7152494, at *7–13.

   1. *Miranda* Warning

   Before a suspect can be subjected to custodial interrogation, he must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479. No "talismanic incantation" or "verbatim recital" is required to satisfy Miranda. California v. Prysock, 453 U.S. 355, 359, 360 (1981). "[R]eviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.'" Florida v. Powell, 559 U.S. 50, 60 (2010) (alterations in original) (quoting Duckworth v. Eagan, 492 U.S. 195, 203 (1989)).

   Petitioner argues that Detective Barba's Miranda advisement in Spanish was so grammatically flawed that the detective failed to adequately convey Petitioner's right to appointment of counsel if Petitioner cannot afford one. (ECF No. 1 at 18). The state court found that Detective Barba gave the following advisement to Petitioner in Spanish: "If you don't have, you can pay an attorney then the county will pay an attorney so he can represent you before I ask you any question." Ortega, 2014 WL 7152494, at *11. The state court rejected the interpretation that Barba's warning conveyed that Petitioner would be required to pay for an attorney on his own and then subsequently be reimbursed. Id. Rather, the state court found that the warning "appears to relay the concept that if defendant did not have any money to pay an attorney, the county would pay for an attorney," in accordance with Miranda. Id.

   Here, the California Court of Appeal correctly set forth the Miranda standard and cited to Prysock and Duckworth, which are governing Supreme Court precedent regarding "a suspect's entitlement to adequate notification of the right to appointed counsel." Powell, 559 U.S. at 60–

61. However, neither Prysock nor Duckworth squarely addresses the issue in this case.[5] The Ninth Circuit has addressed claims similar to Petitioner's in United States v. Botello-Rosales, 728 F.3d 865 (9th Cir. 2013), and United States v. Perez-Lopez, 348 F.3d 839 (9th Cir. 2003). In Botello- Rosales, the detective advised the defendant in Spanish, "If you don't have the money to pay for a lawyer, you have the right. One, who is free, *could* be given to you." 728 F.3d at 867 (emphasis added). The Ninth Circuit held the warning did not satisfy Miranda because the detective incorrectly used the Spanish word "libre" to mean "free," as in without cost, but "libre" correctly translates to "being available or at liberty to do something." Id. The wording "suggests that the right to appointed counsel is contingent on the approval of a request or on the lawyer's availability, rather than the government's absolute obligation." Id. In Perez-Lopez, the defendant was advised in Spanish, "you have the right to solicit the court for an attorney if you have no funds." 348 F.3d at 847. The Ninth Circuit held the warning did not satisfy Miranda because "it did not convey . . . the government's *obligation* to appoint an attorney for indigent accused. To be required to 'solicit' the court . . . implies the possibility of rejection." Id. at 848.

Although Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents," Campbell v. Rice, 408 F.3d 116, 1170 (9th Cir. 2005) (*en banc*), the Supreme Court has "repeatedly emphasized [that] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court'" for purposes of § 2254(d)(1), Glebe v. Frost, 135 S. Ct. 429, 431 (2014) (*per curiam*) (citing Lopez

---

[5] In Prysock, the suspect was advised in pertinent part: "You have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning. . . . you have the right to have a lawyer appointed to represent you at no cost to yourself." 453 U.S. 356–57. The appellate court had found the warnings inadequate because they did not expressly convey that appointment of counsel could occur prior to questioning. The Supreme Court upheld the warning, finding that "nothing in the warnings . . . suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general" and that they conveyed the suspect's "right to have a lawyer appointed if he could not afford one prior to and during interrogation." Id. at 360–61. In Duckworth, the suspect was advised in pertinent part: "You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.*" 492 U.S. at 198. The appellate court had found the warning inadequate because the "if and when you go to court language suggested that only those accused who can afford an attorney have the right to have one present before answering any questions, and implied that if the accused does not go to court . . . the accused is not entitled to counsel at all." Id. at 203 (brackets and internal quotation marks omitted). The Supreme Court found that this warning satisfied Miranda, noting that the instruction accurately described the procedure for the appointment of counsel and simply anticipated a commonplace follow-up question of when a suspect will obtain appointed counsel. Id. at 204, 205.

v. Smith, 135 S. Ct. 1, 4–5 (2014) (*per curiam*)). In the instant case, the California Court of Appeal distinguished Perez-Lopez, finding "nothing in the advisement here implied [Petitioner] could be denied an attorney" and "[t]he fact that the warning referenced the county would pay the attorney dispelled any notion [Petitioner] would have to pay first and seek reimbursement later." Ortega, 2014 WL 7152494, at *10, 11.

Petitioner also challenges the accuracy of Barba's question following the advisement asking whether Petitioner understood his right to appointment of counsel. (ECF No. 1 at 19). Certified Spanish interpreter Janet Trujillo translated Barba's question as "Do you understand *their* rights?" rather than "Do you understand *your* rights?" because Barba used the informal form of the verb. (3 CT 583). However, Trujillo also testified, "as an interpreter, I would have little difficulty accepting that as 'Do you understand?'" (3 CT 583). In light of the expert's testimony, it was not objectively unreasonable for the state court to find that Barba asked Petitioner if he understood his right to appointment of counsel.

The state court's determination that the warnings reasonably conveyed to Petitioner his rights as required by Miranda was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. See Woods v. Donald, 135 S. Ct. 1372, 1377 (2015) (noting that if no Supreme Court case "confront[s] 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from" the Supreme Court") (quoting Smith, 135 S. Ct. at 4); White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (An unreasonable application of clearly established federal law "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice.") (quoting Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003)). The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

2. Waiver

After the Miranda warnings have been given and an opportunity afforded the suspect to exercise his rights, a suspect "may knowingly and intelligently waive these rights and agree to answer questions or make a statement." Miranda, 384 U.S. at 479. "The waiver inquiry 'has two

distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Berghuis v. Thompkins, 560 U.S. 370, 382–83 (2010) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). The prosecution bears the burden of establishing a valid waiver by a preponderance of the evidence. Id. at 384. To determine whether a waiver was voluntary and knowing, reviewing courts must consider the totality of the circumstances, including the accused's background, experience, and conduct. See Burbine, 475 U.S. at 421; North Carolina v. Butler, 441 U.S. 369, 374–75 (1979); Cox v. Del Papa, 542 F.3d 669, 675 (9th Cir. 2008).

Whether a Miranda waiver was made knowingly is a question of fact. United States v. Liera, 585 F.3d 1237, 1246 (9th Cir. 2009). "A state court's decision is based on unreasonable determination of the facts under § 2254(d)(2)[6] if the state court's findings are 'unsupported by sufficient evidence,' if the 'process employed by the state court is defective,' or 'if no finding was made by the state court at all.'" Hernandez v. Holland, 750 F.3d 843, 857 (9th Cir. 2014) (quoting Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004)). Petitioner argues that the trial court erroneously disregarded evidence of Petitioner's ability to understand and communicate in Spanish, specifically that he struggled with reading and writing, and the fact that he only had two years of formal education. (ECF No. 1 at 22–24).

The state court record, including the video of Petitioner's interview, supports the California Court of Appeal's determination that Petitioner voluntarily and knowingly waived his Miranda rights. Certified Spanish interpreter Janet Trujillo testified that Petitioner is fluent in

---

[6] Two provisions of the AEDPA, 28 U.S.C. § 2254(d)(2) and (e)(1), govern the review of state court determinations of fact. The Court notes there is some confusion in Ninth Circuit cases as to how these provisions interact, and the Supreme Court has not addressed the relationship between § 2254(d)(2) and (e)(1). See Wood v. Allen, 558 U.S. 290, 300 (2010); Murray v. Schriro, 745 F.3d 984, 998–1001 (9th Cir. 2014) (acknowledging the Ninth Circuit's two lines of cases and noting that any tensions between various Ninth Circuit cases or between Ninth Circuit cases and limited statements by the Supreme Court will have to be resolved by the Ninth Circuit en banc or by the Supreme Court). However, the Ninth Circuit's conflicting cases and the differences between the statutory provisions are not relevant here because state court findings that are based entirely on the state court record are reviewed for "an unreasonable determination of the facts" under 28 U.S.C. § 2254(d). See Murray, 745 F.3d at 1001.

Spanish. (3 CT 586). On the other hand, Dolores Espinosa administered an exam[7] to evaluate Petitioner's language skills in Spanish, and Petitioner tested at the second to lowest level of proficiency, which correlates to a non-Spanish speaking designation. (3 CT 592, 595, 598). Espinosa testified that Petitioner had difficulties when she used academic language in a question. He did not understand those questions and could not answer in complete sentences, using only nouns. (3 CT 595–96). However, Espinosa agreed that Petitioner is "clearly a Spanish speaker" and "that his skills in Spanish are not suitable or had not learned the particular jargon . . . of the academic world." (3 CT 600). Espinosa testified that the results of the exam were limited to the academic environment and that the exam could not assess Petitioner's "functioning in any other environment, oral language, skills or otherwise." (3 CT 601). Petitioner's lack of formal education and his inability to read or write Spanish would not affect Petitioner's ability to understand Detective Barba's *oral* Miranda advisement.

The state court reasonably found that Petitioner understood Detective Barba's advisement that, as discussed in section IV(A)(1), *supra*, complied with the requirements of Miranda. The Court finds that the state court's determination that Petitioner voluntarily and knowingly waived his Miranda rights was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Accordingly, the Court finds that Petitioner is not entitled to habeas relief on his first claim and it should be denied.

## B. Exclusion of Third Party Culpability Evidence

In his second claim for relief, Petitioner asserts that his due process right to present a complete defense was violated by the trial court's exclusion of third party culpability evidence. (ECF No. 1 at 7). Respondent argues that (1) this claim is procedurally barred based on

---

[7] Espinosa testified that the exam is typically administered to evaluate the academic level of Hispanic students. (3 CT 601). Depending on the students' "ability or their level or skills that they have in their native language, [the school] can determine where to place them in English." (3 CT 602).

California's contemporaneous objection rule, and (2) the state court's rejection of the claim was neither contrary to nor an unreasonable application of Supreme Court precedent. (ECF No. 13 at 35–36).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's third party culpability evidence claim, the California Court of Appeal stated:

## II. Third Party Culpability Evidence Was Properly Excluded

During trial, defendant moved to admit evidence regarding a prior incident that took place at the Clifford Street house. Defendant presented an offer of proof that Vazquez had previously told officers Valencia participated in a crime at the Clifford house. He argued the evidence would demonstrate third party culpability in that it showed Mosca and Cheque were also involved in the plot. The defense theory was that everyone at the Clifford house was in on the setup, and the modus operandi was identical between the two crimes. Defendant claimed he also needed to impeach Vazquez with the assertion that the others were not involved in the plot.

Additionally, defendant argued the evidence was relevant because it demonstrated why he would "be fearful of ... Valencia after just meeting him for the first time and seeing him act on this case." He argued the "jury needs to hear a more complete aspect of who ... Valencia is and how he was acting in this place at virtually the same time." Defense counsel concluded:

"I think it impeaches [Vazquez] with his statement with regard to [his] helping ... Valencia. I think that's not credible. He's testified in the Reyes trial that that's why he went along. I think that's subject to cross examination and demonstration that that's false, that ... Valencia doesn't need assistance because he is this super violent person. And it allows me to go ahead and put third-party culpability into Pedro Vazquez Gonzales and Ezequiel Rios. These are people that have not been charged in this case, and certainly ... Vazquez was aware of that. And the fact that he didn't assist in bringing them before the court here when they're good for—they're good for this homicide more directly than my client is, I think that's all information that the jury needs to know."

During the hearing, Vazquez testified he was aware that 10 days prior to this offense, Valencia was involved in an incident at the Clifford Street house where a young woman was bound with tape. The incident was related to another incident where Valencia had his gun stolen from him. Vazquez assisted Valencia in the

current case because Valencia had previously been jumped and had his gun stolen.

After hearing the testimony, the court indicated it was not inclined to introduce the evidence without further foundational testimony. Subsequently, the court received transcripts of prior testimony taken during Reyes's trial. The evidence had originally been offered by the prosecution to demonstrate Reyes planned the details of the kidnapping with Valencia, or at the very least knew Valencia was the type of person to kidnap the victim in this aggravated manner.

During the prior hearing, Savannah S. testified she occasionally stayed at the Clifford Street house in October of 2007. On October 14, Savannah had an argument with Myra[8] and was later assaulted by Valencia. Valencia was armed with a rifle. She denied Reyes was present and denied even knowing him. Savannah testified she was held at the Clifford house for one night by Valencia and was released in the morning. She had been forced to get into a suitcase and stay there overnight. Checka[9] was also there and helped tie her up. She indicated Mosca was also present but denied he did anything. During the assault, Valencia had a rifle and tied her up with duct tape. Specifically, he put tape over her mouth. Her hands and feet were also bound. She was physically assaulted by Myra. Valencia had previously threatened to take her into the country and hold her in a cage.

Turlock Police Detective Brandon Bertram testified he investigated the assault on Savannah S. He explained she had identified Valencia as the man who assaulted her at the Clifford house. In addition, she identified Reyes as being present when she was restrained and that he did nothing to help her nor did he call the police. She admitted to knowing Reyes prior to the incident and that they had had sexual intercourse on two prior occasions. Savannah and Myra had previously been arrested together for shoplifting.

Detective Gibson testified he was involved in investigating the death of the victim and had interviewed Reyes regarding his participation. In the course of the investigation detectives asked Reyes to take them to the location where the victim was abducted. Reyes directed the detectives around the city for approximately one hour before finally directing them to the Clifford Street house.

Defendant argued the above evidence would impeach Vazquez's testimony regarding who was involved in the kidnapping, and to demonstrate the "manner in which this event went astray can be laid at the feet of ... Vazquez, ... Valencia, and ... Reyes because it's the common scheme and plan that they used at least once, if not more." When both the prosecutor and the court questioned how the evidence would impeach Vazquez, defendant explained the evidence also demonstrated third party culpability. "We have uncharged people who are clearly involved. Now who they are is not clear because depending on which sworn testimony you take from ... Vazquez, it was either Cheque or Mosca who assisted in the home invasion kidnap."

The court commented the one problem it had with the relevance of the evidence was that "it's undisputed and the prosecution is not claiming that your client was involved in whatever incident took place at Clifford." Defense counsel explained evidence there were others involved diminished his client's role in the

---

[8] This appears to be an alternate spelling of Mayra.
[9] This appears to be an alternate spelling of Cheque.

kidnapping, ultimately arguing that what happened was "not something that was contemplated by [defendant]" and that the facts of the offense were "contrary to the manner in which ... Vazquez has testified." It was the defense theory that there were six people inside the Clifford house when Valencia and Vazquez came in and, in a ruse, told everyone to get down and immediately taped the victim's face so she would not recognize anyone and know she had been set up. He theorized the people inside the home when the victim was abducted included Cheque, Mosca, and Mayra as they lived at the house and were involved in the prior incident. He related this to the victim's recorded statement where she mentioned there were "six of us" at the house when she was abducted.

The court explained it failed to see how the "events that occurred at the Clifford residence ten days before have any substantial relevance to impeach the testimony of Vazquez or whoever here." Additionally, the court found a "substantial prejudicial effect ... on the proceedings because it brings another entire new set of circumstances into play." The court further found the evidence did not necessarily impeach the victim's statement as it was ambiguous as to whether she was referring to the number of people in the house or the number of people in total after the perpetrators entered. The trial court denied the motion.

Defendant contends the evidence would have shown Valencia was the one who orchestrated the kidnapping and would have raised a reasonable doubt as to his liability for the kidnapping, the first degree murder charge, and the kidnapping special circumstance. We disagree.[10]

In *People v. Hall* (1986) 41 Cal.3d 826, 833, our Supreme Court held third party culpability evidence is admissible when it is "capable of raising a reasonable doubt of defendant's guilt." The evidence is treated "like any other evidence: if relevant it is admissible ( [Evid.Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion ( [Evid.Code,] § 352)." (*Id.* at p. 834.) Improper exclusion of the evidence is evaluated under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 837, namely, whether it is reasonably probable the defendant would have received a more favorable result had the evidence been admitted. (*People v. Hall, supra,* at p. 836; *People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

It is well settled that the application of the ordinary rules of evidence do not infringe on a defendant's right to present a defense. (*People v. Fudge, supra,* 7 Cal.4th at pp. 1102–1103; *People v. Hall, supra,* 41 Cal.3d at p. 834.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge, supra,* at p. 1103.)

In *Holmes v. South Carolina* (2006) 547 U.S. 319, 326–327, the United States Supreme Court recognized this principle as it related to third party culpability evidence. Where the evidence is capable of raising a reasonable doubt as to the defendant's guilt, it should be admitted. However, where the evidence serves no legitimate purpose or its probative value is outweighed by other factors such as undue prejudice or the potential for confusing or misleading the jury, it may

---

[10] Defendant argues the trial court's exclusion of the evidence denied him the right to present a defense and was a violation of his due process rights. The People assert defendant's claim was forfeited, arguing he did not raise this particular ground in the trial court. We agree. However, in order to forestall an ineffective assistance of counsel claim, we will address the issue.

properly be excluded without running afoul of the constitution. (*Ibid.*) Thus, we must examine the evidence in context of the trial to determine whether it was properly excluded.

The evidence defendant sought to admit was not capable of raising a reasonable doubt as to his guilt. Defendant argues the evidence would have "dispelled any conclusion that [defendant] was directing [Valencia's] actions, and showed that [defendant] did not share his intent, and Valencia's actions were not contemplated by him when [defendant] requested Reyes's help to recover the stolen marijuana." We disagree. It was undisputed at trial that defendant was not present when the kidnapping occurred. While there was evidence defendant contacted Reyes to assist in the recovery of the drugs, virtually no evidence was introduced as to the agreement between Reyes and defendant. It was undisputed that Reyes contacted Valencia, a person unknown to defendant, to carry out the offense. To the extent there was evidence demonstrating defendant knew the victim would be kidnapped, there was no evidence establishing he knew the exact means of how that would be carried out and who exactly would be involved. There was no evidence defendant was in contact with Valencia prior to the kidnapping. That Valencia was in charge of the actual kidnapping was never contested. Therefore, evidence that Valencia engaged in a similar incident sometime earlier would shed little light on defendant's intent. As defendant was not present during the kidnapping, his liability stemmed from his subsequent actions. Regardless of whether Valencia had a certain modus operandi regarding assaulting women, that evidence simply was not probative of defendant's intent. Defendant was not tried as a direct perpetrator regarding the kidnapping; instead he was tried under an aiding and abetting theory. That there may have been others who were also liable as direct perpetrators was of little relevance. Indeed, the trial was replete with evidence that several people were involved in the commission of the crime. But that evidence did not tend to negate defendant's guilt.

The evidence would only have served to demonstrate Valencia had a proclivity to assault and bind the victim. Notably, the evidence defendant sought to introduce did not establish a prior kidnapping. The testimony only established Savannah was bound with tape and assaulted and that Valencia carried a rifle. There was no testimony at the hearing that Savannah was taken from the house and transported anywhere. Quite the opposite, she was made to remain in the home, inside a suitcase. While the evidence may have established it was Valencia's idea to bind and assault the victim, it shed little light on who made the decision to kidnap Avina. In any event, Valencia brought the victim to Cebrero and defendant. With full knowledge that Avina had been abducted, defendant met with the others and participated in the later events. Therefore, the evidence defendant sought to introduce did not have the capability of reducing his culpability for the crime.

Defendant argues the evidence would demonstrate he was not the mastermind of the kidnapping. Not so. First, the People were not required to prove defendant was the mastermind of the kidnapping, they only had to prove defendant aided and abetted in the kidnapping. Second, the excluded evidence did not include a kidnapping. According to the testimony, Savannah was never transported; she was forced to remain inside the home, inside of a suitcase. Third, there was never an argument that defendant orchestrated the particulars of Avina's abduction. There was evidence from which the jury could infer defendant knew the victim would be abducted, but no evidence he knew or masterminded the particulars. Rather, the evidence strongly indicated the abduction was orchestrated by Valencia. Regardless, however, the excluded evidence was irrelevant to defendant's later

actions, which consisted of the bulk of the evidence against him. Therefore, the evidence was properly excluded.

To the extent defendant argues the evidence demonstrated why he feared Valencia, we note the evidence was undisputed that defendant did not know Valencia prior to meeting him after the victim was abducted, and there was no evidence offered to show defendant ever learned of the prior incident. Thus Valencia's prior acts could not in any way demonstrate defendant's fear of Valencia.

Even if we were to conclude the trial court should have admitted the evidence, we would find any error harmless. In *People v. Hall, supra,* 41 Cal.3d 826, the leading case on third party culpability evidence, the Supreme Court found the trial court erred in excluding the proffered evidence. There, the victim was found dead in his home with hemorrhaging on his eyelids but no external signs of trauma nor evidence of forced entry to the home. The cause of death was initially ruled to be cardiac arrhythmia incident to heart disease. Approximately one year later, information provided by Rhae Foust indicated the defendant was responsible for the victim's death. Foust provided that information after he had been arrested on unrelated charges. According to Foust, defendant admitted he had killed the victim with a coperpetrator. He provided details of the crime that were corroborated by the crime scene. He claimed he had driven the victim to the bank previously and had seen him with a large sum of money. After the defendant's arrest he admitted he and his coperpetrator had given the victim a ride to the bank, but denied any participation in the murder. Rather, he claimed his coperpetrator had told him he killed the victim. He admitted he might have boasted to Foust about participation in the murder to impress him, however, he denied relaying any of the details of the murder. At trial the defendant sought to introduce evidence that Foust was the killer, he had knowledge of the details of the murder because he committed the crime, and that Foust was left-handed. Evidence suggested the killer was left-handed. (*People v. Hall, supra,* 41 Cal.3d at pp. 829–830.)

Although the court found it was error to exclude the evidence, the error was harmless. Much of the evidence the defendant sought to admit had already been placed before the jury; his knowledge of the details of the murder, his left-handedness, and the presence of a certain type of shoe print at the scene. Indeed, defense counsel argued Foust was the murderer in closing argument. (*People v. Hall, supra,* 41 Cal.3d at p. 835.) Additionally, the court found the evidence would not tend to exculpate the defendant because "no testimony or circumstantial evidence limited the number of perpetrators, Foust's participation would not undermine the significant evidence linking defendant to the murder." (*Id.* at p. 835.)

Likewise here, the evidence defendant sought to admit would not have undermined the evidence linking him to the kidnapping and murder. Evidence was already presented at trial that Cheque was involved in the kidnapping, that Valencia had planned the particulars of the kidnapping with Reyes, and that defendant was not present when the actual kidnapping occurred. Notably, the testimony at the prior hearing was that only Cheque was involved, Mosca was there but did not participate. Neither did Reyes according to Savannah. As none of the proffered evidence had any bearing on defendant's actions that took place after the kidnapping, any error was necessarily harmless.

Ortega, 2014 WL 7152494, at *13–18 (footnotes in original).

1   Although the California Court of Appeal found that Petitioner's claim was forfeited
2   because he failed to raise any contemporaneous objection at trial that exclusion of the third party
3   culpability evidence denied Petitioner his right to present a defense and violated due process, the
4   court also considered the claim on the merits. <u>Ortega</u>, 2014 WL 7152494, at *15 n.7. Therefore,
5   the Court will consider this claim on the merits and apply the AEDPA's deferential standard of
6   review. <u>See</u> <u>Clabourne v. Ryan</u>, 745 F.3d 362, 383 (9th Cir. 2014) (finding that where state court
7   denied relief on procedural grounds and alternatively addressed the merits, "AEDPA deference
8   applies to this alternative holding on the merits"), <u>overruled on other grounds by</u> <u>McKinney v.</u>
9   <u>Ryan</u>, 813 F.3d 798 (9th Cir. 2015) (<i>en banc</i>).

10   Here, the California Court of Appeal found that even if the trial court erred by failing to
11   admit the third party culpability evidence, "any error was necessarily harmless." <u>Ortega</u>, 2014
12   WL 7152494, at *18. The Supreme Court has held that "when a state court determines that a
13   constitutional violation is harmless, a federal court may not award habeas relief under § 2254
14   unless <i>the harmlessness determination itself</i> was unreasonable." <u>Fry v. Pliler</u>, 551 U.S. 112, 119
15   (2007) (citing <u>Mitchell v. Esparza</u>, 540 U.S. 12 (2003) (per curiam)); <u>Ayala</u>, 135 S. Ct. at 2199.
16   "[T]he test for determining whether a constitutional error is harmless . . . is whether it appears
17   'beyond a reasonable doubt that the error complained of did not contribute to the verdict
18   obtained.'" <u>Neder v. United States</u>, 527 U.S. 1, 15 (1999) (quoting <u>Chapman v. California</u>, 386
19   U.S. 18, 24 (1967)).

20   Petitioner contends that the third party culpability evidence demonstrated that he had not
21   planned or participated in the charged offenses and that his involvement was nothing but a casual
22   relationship with the offenders. (ECF No. 1 at 28). Specifically, Petitioner argues that the
23   evidence showed that: the offense was the brainchild of Valencia and not within Petitioner's
24   intention or contemplation; Valencia was a violent and fearsome gang member, which explained
25   why other witnesses would lie or withhold information and why Petitioner would either
26   participate in the killing or falsely claim to have done so; and Vasquez lied to protect his friends
27   and associates by minimizing their involvement. (<u>Id.</u> at 29).

28   ///

The California Court of Appeal's harmless error determination was not objectively unreasonable. The jury could infer from the evidence introduced at trial that Valencia planned the kidnapping. (1 RT 148–65). Additionally, the prosecution was not required to prove that Petitioner planned the kidnapping in order for him to be convicted. Thus, exclusion of the evidence showing that the kidnapping was the brainchild of Valencia did not prejudice Petitioner. The prosecution's theory of the case was that Petitioner aided and abetted Avina's kidnapping. (4 RT 729). It was undisputed that Petitioner was absent when Avina was abducted at the Clifford house. (1 RT 151–65; 4 RT 729; 4 CT 884–85, 892–95, 923–24). Evidence of a prior incident with similar modus operandi may have bolstered an argument that individuals involved in the prior incident were direct perpetrators of Avina's kidnapping and Vasquez falsely minimized their involvement, but said evidence is not probative of Petitioner's intent and does not otherwise negate Petitioner's liability that stemmed from his actions after the first movement against the victim's will and as the kidnapping was continuing. Thus, exclusion of the evidence did not prejudice Petitioner in this regard. It also was undisputed that Petitioner did not know Valencia before the offense, and Petitioner does not establish that he knew of this prior incident at the time of the offense. (4 CT 883). Petitioner cannot demonstrate that this prior incident caused him to fear Valencia at the time of the offense, and thus exclusion of the evidence did not prejudice Petitioner in this regard.

Based on the foregoing, the Court finds that the state court's harmless error determination regarding the exclusion of the third party culpability evidence was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim and it should be denied.

## C. Sufficiency of Evidence

In his third and fourth claims for relief, Petitioner asserts that there was not sufficient evidence to support the kidnapping conviction and the three special circumstance findings. (ECF

No. 1 at 8, 10, 42, 44). Respondent argues that the state court's denial of Petitioner's sufficiency of evidence claims were reasonable. (ECF No. 13 at 38, 48).

1. Legal Standard

The United States Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (quoting Jackson, 443 U.S. at 319).

The Supreme Court recognized that Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam). Moreover, when the AEDPA applies, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. The Supreme Court cautioned that "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Id.

2. Kidnapping

Petitioner asserts there was insufficient evidence to support the kidnapping conviction because there was no evidence that he knew of the others' purpose beyond retrieving Cebrero's

property or that Petitioner gave any aid or encouragement with respect to the kidnapping. (ECF No. 1 at 42). Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the sufficiency of evidence claim with respect to the kidnapping conviction, the California Court of Appeal stated:

### III. The Evidence Was Sufficient to Support the Kidnapping Charge as Well as the Felony–Murder Special Circumstance

Defendant contends the evidence was insufficient to support the kidnapping charge or the three felony-murder special circumstances. He claims there was no evidence from which the jury could infer defendant intended to aid in or facilitate a kidnapping. He further argues, as to the felony-murder special circumstances, that the evidence did not support a finding he harbored the intent to commit the underlying felonies independent of the murder. Rather, he argues the felonies were simply incidental to the murder and, therefore, the special circumstances were improperly imposed. We disagree.

### A. Legal Principles

When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Further, we review

> "the evidence in the light most favorable to the prosecution, [asking whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

"Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

"Whether the evidence presented at trial is direct or circumstantial, ... the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found

the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Towler* (1982) 31 Cal.3d 105, 118–119.)

" 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.] [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

**B. The Evidence Was Sufficient to Support the Kidnapping Charge**

Defendant argues the evidence was insufficient to support the kidnapping charge as the evidence failed to establish he aided in the kidnapping in any way. He further contends the special circumstance must be reversed because to the extent his actions could be viewed as aiding in the kidnapping, the kidnapping was merely incidental to the murder. We find the evidence was sufficient as to both the kidnapping charge as well as the special circumstance.

To prove guilt on an aiding and abetting theory, the prosecution must prove: (1) the direct perpetrator committed a crime; (2) the defendant knew of the perpetrator's unlawful intent and he intended to assist in the offense; and (3) the defendant engaged in conduct that in fact assisted in the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) While "[m]ere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting" (*In re Michael T.* (1978) 84 Cal.App.3d 907, 911), it is a circumstance to be considered along with the defendant's companionship and conduct before and after the offense. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *People v. Laster* (1971) 18 Cal.App.3d 381, 388 ["while mere presence at the scene of an offense is not sufficient in itself to sustain a conviction, it is a circumstance which will tend to support a finding that an accused was a principal"].) A defendant may be held liable if he "in any way, *directly or indirectly,* aided the perpetrator by acts or encouraged him by words or gestures." (*People v. Fleming* (1961) 191 Cal.App.2d 163, 168.)

Whether the defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment. (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

The doctrine of aiding and abetting " 'snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime, even though the actor does not personally engage in all of the elements of the crime.' " (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) "Aiding and abetting does not require participation in an agreement to commit an offense, but merely assistance in committing the offense. [Citation.]" (*People v. Morante* (1999) 20 Cal.4th 403, 433.) However, "if a person in fact aids, promotes, encourages or instigates commission of a crime, the requisite intent to render such aid must be formed *prior to or during* 'commission' of that offense. [Citations.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) This does not mean advance knowledge is a prerequisite for liability (*People v. Swanson–Birabent* (2003) 114

Cal.App.4th 733, 742); "[a]iding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself. [Citation.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 532.) Moreover, "it is not necessary that the primary actor expressly communicate his criminal purpose to the defendant since that purpose may be apparent from the circumstances. [Citations.]" (*Id.* at pp. 531–532.)

The evidence was undisputed that the victim was kidnapped, and defendant does not challenge that fact.[11] Defendant argues only that his actions were insufficient to facilitate the kidnapping. We disagree. The evidence established defendant initially called Reyes after Cebrero told him the victim had stolen the drugs. He did so, he claimed, to help get the drugs back. That he knew something nefarious would happen to the victim could be inferred from his statement that he counseled Cebrero to think twice about what he was going to do because this was not a "game" and from the fact he later had Reyes and Cebrero communicate directly with each other so he would not know anything.

Defendant was aware Cebrero had loaned his vehicle to Reyes, and he waited with Cebrero until Reyes recontacted him to let him know he had the victim. Defendant went with Cebrero to meet the others where they were holding the victim in the car on the Westside, knowing the victim had been kidnapped. He was present when the victim was interrogated about the location of the drugs, and he joined Cebrero with the others in the Pontiac while the victim was in the trunk. Defendant accompanied the others to the Sycamore Street house where the men, according to Vazquez, immediately exited the car, walked into the field, and stood together talking. When Vazquez approached, they were discussing what to do with the victim. Specifically, Vazquez noted defendant was doing most of the talking, and he said it was "kind of bad" that the victim did not have the drugs. It was during that time that Valencia said he knew what to do and instructed Vazquez to retrieve a bottle. Valencia filled the bottle with gasoline and, after a private discussion with Cebrero and defendant, the three men got back into the Pontiac and transported the victim to the field where defendant ultimately set her on fire. These facts all lead to the inference that defendant knew of the plan to kidnap the victim from the beginning and aided in the plan by calling Reyes and asking for his help.

Additionally, when defendant told Cebrero he was going to put him in touch with Reyes, he advised Cebrero to " '[t]hink about it twice, because it's not going to be easy' " and also said it "is not a game." Defendant claimed the plan was never to kill the victim, however, his admission that he knew the plan was not to kill initially leads to the inference that he knew of the original plan. One could infer he had some knowledge they were going to kidnap the victim from the fact that he knew there was a plan, he knew Cebrero had loaned his car to Reyes, he waited with Cebrero until Reyes contacted him saying they had the victim, and he went with Cebrero to meet the others.

Even if we were to assume defendant did not aid in the kidnapping until after he accompanied Cebrero to the Westside where the victim was being held in the Pontiac, we would still find the evidence sufficient to support the verdict. Valencia called Cebrero and said they had the victim. Defendant knew this because he was with Cebrero at the time. He further claimed he told Cebrero to let

---

[11] Defendant notes that kidnapping requires asportation of the victim. While the crime of simple kidnapping indeed requires an asportation element, the crime of kidnapping for extortion or to take something of value does not. (*People v. Rayford* (1994) 9 Cal.4th 1, 11–14 & fn. 8.)

the victim go if she did not have the drugs. Defendant argues these acts are insufficient to support liability on an aiding and abetting theory. However, defendant's argument fails to take into account the fact his intent to aid and abet the kidnapping need not precede the initial movement against the victim's will. Kidnapping is a continuing crime, that "continues until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159.) Thus, when defendant was assisting Cebrero by providing counsel and encouragement before the victim was ultimately set on fire, he was in fact assisting the kidnapping. (E.g., *People v. Burney* (2009) 47 Cal.4th 203, 233–234 [kidnapping of victim still in progress when defendant stopped car, opened trunk, and shot victim]; *People v. Silva* (1988) 45 Cal.3d 604, 632 ["Because [the victim] was still being detained at the time of his murder, he was killed while defendant was engaged 'in the commission of' the kidnapping"]; *People v. Farmer* (1983) 145 Cal.App.3d 948, 952 ["A victim forcibly transported without [his] consent is still 'kidnaped' while the detention continues and an injury inflicted during detention is inflicted 'in the commission of' the kidnaping"].)

In order to be guilty as an aider and abettor of the kidnapping, the defendant need not assist the entire kidnapping. (*People v. Montoya, supra*, 7 Cal.4th at p. 1039.) Assistance given during any portion of the offense will suffice. Defendant aided in the kidnapping while it was in progress. When defendant arrived at the Westside, the victim had been kidnapped and was still in the trunk. When the men gathered to decide what to do with her, the kidnapping was still ongoing. When defendant discussed what to do with the victim, he was aiding or encouraging the kidnapping in progress. Regardless of whether defendant intended that the victim be abducted initially, he fully participated in the kidnapping thereafter by taking part in the planning regarding what to do with the victim. Due to the ongoing nature of the kidnapping, the crime was not complete until defendant, Cebrero, and Valencia fled the scene after setting the victim on fire. His participation in the events leading up to that point constituted aiding and abetting of the crime. His kidnapping conviction is therefore supported by substantial evidence.

Defendant claims he was simply present at the scene with the others and his presence was insufficient to support his conviction for aiding and abetting the kidnapping. He relies upon *In re Michael T., supra*, 84 Cal.App.3d 907 to support his contention. There, the court found facts that a minor was nearby during a murder, made a statement that there would be a shooting, and later identified with the shooter and approved of his actions was insufficient to support a finding that he aided and abetted in a murder. (*Id.* at p. 911.) He did not, like defendant, go to the scene knowing the crime was in progress and join the perpetrators as the crime was being committed. Rather, this case is more similar to *People v. Le Grant* (1946) 76 Cal.App.2d 148, disapproved on another ground in *People v. Cox* (2000) 23 Cal.4th 665, 675. There, the defendant was driving a car with several companions. Alongside of his car, the victim was driving with two female companions. Words were exchanged between the vehicles, and someone in the defendant's car said, " 'do you want to make something of it,' " to which the victim responded, " 'sure.' " (*People v. Le Grant, supra*, at p. 150.) The defendant pulled his car to the curb ahead of the victim's car, and he and his companions exited and stood together on the sidewalk. The victim approached, and one of the defendant's companions struck him, knocking him through a plate glass window from which he suffered fatal injuries. The defendant did not move from where he was originally standing nor did he physically participate in the attack. He kept onlookers back to make sure it was a fair fight. (*Id.* at p. 151.) The defendant was convicted of voluntary manslaughter as an aider and abettor. The Court of Appeal

concluded the evidence was sufficient to find he had aided and abetted in voluntary manslaughter because (1) he was the owner and operator of the vehicle from which the challenging remarks were made, (2) it was in his power to have ignored the challenge and driven on, (3) he turned into the curb ahead of the victim's vehicle and exited the car in the company of the other two male occupants, (4) he stood with them, and (5) he sought to keep other people back. (*Id.* at pp. 153–154.) The facts here supporting a finding that defendant aided and abetted the others are at least as compelling as those in *People v. Le Grant.*

After contacting Reyes to help with the problem of the victim taking the drugs, defendant, knowing the victim had already been kidnapped, voluntarily accompanied Cebrero to where the victim was being held, joined the others in the car while the victim was bound in the trunk, actively took part in the discussion regarding her fate, joined the others in transporting her to the field, ultimately set her on fire after she had been doused with gasoline, and fled the scene with the others. This evidence was sufficient to establish, at a minimum, that defendant aided and abetted the kidnapping of the victim. "[P]resence at the scene of the crime, while insufficient of itself to make one an aider and abettor, is one factor which tends to show intent. Other factors which may be considered include the defendant's failure to take steps to prevent the commission of the crime, companionship, and conduct before and after the crime." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 893.) Each of these factors suggests defendant shared the intent to kidnap the victim.

Furthermore, we note:

> "Direct evidence of the mental state of the accused is rarely available except through his or her testimony. The trier of fact is and must be free to disbelieve the testimony and to infer that the truth is otherwise when such an inference is supported by circumstantial evidence regarding the actions of the accused. Thus, an act which has the effect of giving aid and encouragement, and which is done with knowledge of the criminal purpose of the person aided, may indicate that the actor intended to assist in fulfillment of the known criminal purpose." (*People v. Beeman* (1984) 35 Cal.3d 547, 558–559.)

The evidence established defendant did nothing to try to prevent the crime or to confront the other men about what was happening. Instead, defendant voluntarily accompanied them, participated in the planning process, joined them in the continuing crime, and fled with them. The fact defendant joined the others in the car knowing the victim had been kidnapped and participated in the subsequent planning demonstrated his intent to facilitate the crime. The evidence was sufficient.

Ortega, 2014 WL 7152494, at *18–22 (footnote in original).

Here, the California Court of Appeal applied California state law, which provides that: (1) a defendant may be held liable for aiding and abetting if he in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures; (2) mere presence at a crime scene or mere knowledge that a crime is being committed and failure to prevent it is not sufficient, but is a circumstance to be considered along with the defendant's companionship and

conduct before and after the offense; (3) aiding and abetting liability arises from providing aid

during any portion of an offense with the requisite intent to render such aid being formed prior to

or *during* commission of the offense; and (4) kidnapping is a continuing crime that is still in

progress when a defendant stops the car, opens the trunk, and shoots the victim. Ortega, 2014

WL 7152494, at *19–21 (citations omitted). "[A] state court's interpretation of state law,

including one announced on direct appeal of the challenged conviction, binds a federal court

sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

Viewing the evidence in the light most favorable to the prosecution and presuming that

the jury resolved conflicting inferences in favor of the prosecution, the record established the

following: Petitioner already knew the victim had been kidnapped when he voluntarily

accompanied Cebrero to meet Valencia and Reyes, who were bringing the victim to the

"Westside." (4 CT 892–96). Thereafter, the four men transported the victim to the Sycamore

house where they huddled in a field and conversed. (4 CT 901–02; 1 RT 166–69). Vazquez

testified that Petitioner was doing most of the talking in the huddle. (2 RT 294).When Vazquez

joined them a minute later, they stopped talking. (1 RT 167, 169). After a while, Valencia

described Vazquez's interaction with the victim (*i.e.*, the victim kept saying "Martha" and that

Vazquez had not recovered the marijuana), and Petitioner stated that it was too bad the marijuana

could not be recovered. (1 RT 170–71). Vazquez stated that the victim kept saying "Martha" and

told Petitioner and Cebrero something like, "But there's no weed. And she's right there. And,

you know, whatever you guys want to do with her now, it's up to you guys." (2 RT 298). A little

while later, Valencia said "I know what to do," directed Vazquez to get a bottle, and Valencia

filled the bottle with gasoline. (1 RT 171–72). Valencia, Cebrero, and Petitioner got back into the

Pontiac and transported the victim to the field where she was eventually set on fire. "When the

deference to state court decisions required by § 2254(d) is applied to the state court's already

deferential review," Cavazos, 132 S. Ct. at 6, the state court's determination that Petitioner was

aiding and encouraging the kidnapping when he participated in the discussion in the field about

what to do with the victim was not objectively unreasonable.

///

3.  <u>Kidnapping-Murder Special Circumstance</u>

Petitioner appears to assert that there was insufficient evidence to support the kidnapping-murder special circumstance because the underlying felony was merely incidental to the murder. (ECF No. 1 at 42). Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

In denying the sufficiency of evidence claim with respect to the kidnapping-murder special circumstance, the California Court of Appeal stated:

> Relying upon the rule articulated in *People v. Green* (1980) 27 Cal.3d 1, 59–62, overruled on other grounds by *People v. Martinez* (1999) 20 Cal.4th 225, 241, defendant argues his actions after he entered the Pontiac on the Westside were aiding in a plan to kill the victim, and any facilitation of the kidnapping was merely incident to the murder. We disagree. In *People v. Green,* our Supreme Court explained that a felony-murder special circumstance[12] cannot be sustained where the underlying felony is "merely incidental to the murder." (*People v. Green, supra,* at p. 61.) The court reached this conclusion from the fact the statute governing the felony-murder special circumstance required the murder be committed " 'during the commission or attempted commission of' " the crime. (*Id.* at p. 59.) The People conceded that " 'murder was the prime crime and that the robbery was incidental to the murder, since the underlying motive for the robbery was to leave [the victim's] corpse bereft of anything whatsoever by which she could be identified.' " (*Id.* at p. 62.) Under those circumstances, the special circumstances could not be upheld.

---

[12] Defendant seems to argue, without citation to authority and without any substantive analysis, that his first degree murder conviction must likewise be reversed. As near as we can decipher, this argument is premised upon the theory the first degree murder conviction was tried partly upon the theory that defendant committed the murder while in the perpetration of a kidnapping. (§ 189.) Defendant cites no authority for this proposition, nor makes any specific argument related to this theory, thus he has waived the issue. " 'Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion.' " (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282; see *People v. Hardy* (1992) 2 Cal.4th 86, 150.)

Rather, the briefing is devoted to the rule that in order to support a *felony-murder special circumstance* the defendant must act with an independent felonious purpose. Defendant makes no attempt to explain how this rule, which is based upon the express language of the statute governing the special circumstance, applies to first degree felony murder. While the merger doctrine articulated in *People v. Ireland* (1969) 70 Cal.2d 522 does have some application to the felony-murder rule, that rule has been expressly limited to second degree felony murder. Indeed, courts have repeatedly rejected attempts to apply *Ireland*'s merger doctrine to the felonies enumerated in section 189, including robbery and kidnapping, as those crimes are undertaken for a felonious purpose independent of the homicide. (*People v. Escobar* (1996) 48 Cal.App.4th 999, 1012–1013 [kidnapping], abrogated on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 923; *People v. Kelso* (1976) 64 Cal.App.3d 538, 541–542 [same].)

Unlike *Green,* the evidence here established the kidnapping was the primary crime. Indeed, the prosecution conceded at trial that the initial plan was to kidnap, not kill, the victim. Cebrero wanted to recover his stolen drugs and enlisted Reyes for assistance. Reyes in turn sought assistance from Valencia who conducted the kidnapping. The victim was interrogated multiple times regarding the drugs. After it was clear the drugs were not going to be recovered, the men discussed what steps to take next. The plan to kill the victim was then developed.

Defendant contends the plan to kill the victim was already in place when he entered the Pontiac, and the only intent shown by the evidence at that point was the intent to kill. Any further kidnapping of the victim was merely incidental to the murder. We disagree. From the evidence the jury could have found the plan to kill the victim was not devised until the men were discussing what to do at the Sycamore house, and defendant had the concurrent intents to both facilitate the kidnapping and murder.

On this point, *People v. Barnett, supra,* 17 Cal.4th 1044 is instructive. The defendant had been previously engaged in a gold mining enterprise with the victim. When the defendant unexpectedly confronted the victim, along with others, in a remote area, the defendant shot the victim in the foot, beat him, threatened to kill him, and eventually bound him and forced him, along with the others, into a vehicle. He drove the victim to another location, removed his clothing, and told the others he was going to tie the victim to a tree and leave him in the wilderness. The others heard screaming for some time that abruptly stopped. The defendant returned, saying he had left the victim with fishing line tied to his genitals. He drove the others back to the original location and eventually let them go, but warned them to leave the victim to suffer where he was for several days. After their release, the others attempted to find the victim, however, they fled when they believed they heard the defendant nearby. The following morning they returned to look for the victim, eventually finding him dead inside a vehicle near the area where he had been left. (*People v. Barnett, supra,* at pp. 1069–1075.)

On appeal, the defendant argued the kidnapping-murder special circumstance was not supported by the evidence as there was no evidence he committed the murder to advance the kidnapping. The Supreme Court disagreed, explaining the jury could have found the defendant intended to kidnap the victim apart from his intent to kill. The jury was not required to find the defendant's sole intent from the beginning was to kill the victim. The court pointed out there was evidence the defendant considered letting the victim go prior to the kidnapping, and there was additional evidence he may have killed the victim after letting the others go. (*People v. Barnett, supra,* 17 Cal.4th at p. 1158.) Further, the fact the jury was instructed it could not find the special circumstance true where the kidnapping was merely incidental to the murder reinforced the conclusion. (*Ibid.*)

In addition, the court found the evidence supported a finding the murder was committed to facilitate the kidnapping. The defendant only killed one of his multiple victims, and the jury could have determined the defendant felt the victim was the only one who was likely to report the crime. The evidence supported a finding that the defendant murdered the victim "to advance the kidnappings, to facilitate his escape, or to avoid detection. That defendant may have had concurrent intent, that is, consisting of both an intent to kill and an intent to commit an independent felony, does not invalidate the felony-murder special circumstance." (*Id.* at p. 1159.)

Likewise in *People v. Riel* (2000) 22 Cal.4th 1153, the evidence was sufficient to support a finding the defendant intended to kidnap the victim and subsequently formed the intent to kill him. The defendant along with two other cohorts robbed a convenience store. They absconded with the loot from the register and forced the store clerk to depart with them in a vehicle. As they drove away, the defendant demanded the clerk's wallet. Upon discovering the wallet contained only $13, the defendant stated he was going to kill the clerk. They drove an additional distance and subsequently killed the clerk, leaving his body. (*Id.* at p. 1173.) The court found sufficient evidence to support the kidnapping-murder special circumstance because there was evidence to support a finding the intent to kill the victim was not formed until after the kidnapping began, ostensibly due to the defendant's anger over the small amount of money found in the clerk's wallet. (*Id.* at pp. 1201–1202.)

In *People v. Raley* (1992) 2 Cal.4th 870, the defendant, a security guard, gave an unauthorized mansion tour to two young women. During the tour he locked them in a safe, required they disrobe, bound their hands, and sexually assaulted them. Subsequently he beat and repeatedly stabbed the women and put them in the trunk of his car. He drove for some time, eventually arriving home and allowing the women out of the trunk for a short time. Later that night, he drove the women to a ravine, beat them again and pushed them, still bound, into the ravine. One of the victims died from her wounds but the other survived. (*Id.* at pp. 882–884.) In rejecting an argument the kidnapping was incidental to the murder, the court held the jury was not required to accept the prosecution theory that the defendant planned to kill the victims from the beginning. (*People v. Raley, supra,* at p. 902.) Instead of immediately killing the victims once they were in the trunk of his car, he brought them to his home. The jury could infer the intent to kill was formed after the kidnapping had begun. (*Id.* at p. 903.) The court explained:

> "... This is not a case like *People v. Weidert* (1985) 39 Cal.3d 836, in which it was overwhelmingly clear that the defendant formed a plan to kill a particular victim to prevent his testimony in a subsequent criminal proceeding, and that the kidnapping of the victim was wholly incidental to the planned murder. Nor is it a case like *Green, supra,* 27 Cal.3d 1, 62, in which the defendant's primary purpose was the murder of his wife, and his subsequent removal of her personal property to avoid her identification was purely incidental to the murder.

> "Rather, this case is more like *People v. Ainsworth* [ (1988) ] 45 Cal.3d 984, in which we explained: '*Green* and *Thompson* stand for the proposition that when the underlying felony is *merely incidental* to the murder, the murder cannot be said to constitute a "murder in the commission of" the felony and will not support a finding of felony-murder special circumstance.' (*Id.* at p. 1026.) We concluded in *Ainsworth,* where defendant had kidnapped the victim, put her in his car, and let her bleed to death over a period of hours, that there was substantial evidence from which the jury could have determined that the kidnapping was not merely incidental to the murder." (*People v. Raley, supra,* 2 Cal.4th at pp. 902–903.)

Likewise here, defendant accompanied Cebrero to facilitate the kidnapping. By planning what to do with the victim, who had been abducted and was bound in the trunk, defendant was most certainly facilitating the kidnapping that was still in progress. That they subsequently determined to kill her and cover up the kidnapping did not lessen defendant's intent to assist in the kidnapping itself. It is

well settled that a defendant can harbor multiple concurrent objectives. (*People v. Gurule* (2002) 28 Cal.4th 557, 628 [defendant's primary motivation was to rob victim, murder was committed to facilitate the robbery by eliminating sole witness]; *People v. Wright* (1990) 52 Cal.3d 367, 417, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Barnett, supra,* 17 Cal.4th at pp. 1158–1159.) The jury could determine that at the time defendant joined the men in the Pontiac the victim's fate had not yet been determined. The kidnapping was not incidental to the murder and defendant's actions in planning at the Sycamore Street house facilitated the kidnapping.

Indeed, the evidence established the men discussed at the Sycamore house what to do with the victim. Such a discussion would have been unnecessary if the victim's fate had already been decided. Defendant engaged in planning what to do with the victim when they were unable to recover the drugs. The fact Vazquez noted defendant told the others it was "kind of bad" the victim did not have the drugs demonstrated his intent to engage in the kidnapping itself. After all, the reason for the kidnapping was to extort the victim. Indeed, at the Sycamore house the men were still discussing that they did not recover the marijuana. Vazquez testified he had told defendant and Cebrero that the victim said "Martha" when they were looking for the drugs, and the victim was right there, and it was up to them to decide what to do with her. Thus, it is apparent the men were still actively engaged in the kidnapping and discussing recovering the marijuana. Defendant knew the victim had absconded with the drugs and he wanted to recover them. Defendant was present and contributed to planning what to do, knowing the victim had been kidnapped and the drugs were not recovered. Defendant claimed it was Cebrero's idea to kill the victim. But it is clear he participated in the planning process when the men were still deciding what to do with her. It was not until sometime later that Valencia said he knew what to do and instructed Vazquez to get the plastic bottle. The jury could infer that up to that point, the men were engaged in planning what to do with the victim. (See *People v. Riel, supra,* 22 Cal.4th at pp. 1201–1202 [defendant may not have decided upon victim's fate at the time the kidnapping began and he only " 'formed the intent to kill after the asportation,' " making the kidnapping not merely incidental to the murder].) Once they decided it would be necessary to kill her, defendant harbored concurrent intent. The jury could infer defendant's intent was to facilitate the kidnapping and the recovery of the drugs, and the murder was a means of covering up the original kidnapping.

Although the jury may have been able to infer defendant had the intent to kill the victim at the time he entered the car on the Westside, far from what he argued at trial, it likewise could infer the plan was not devised until much later. This question of whether defendant was an aider and abettor was a question of fact for the jury to resolve. (*People v. George* (1968) 259 Cal.App.2d 424, 429.) The jury was properly instructed regarding when the intent must have been formed and likewise was properly instructed the felony could not be incidental to the murder. The jury concluded kidnapping was not incidental to the murder.

Ortega, 2014 WL 7152494, at *22–25 (footnote in original).

Viewing the evidence in the light most favorable to the prosecution and presuming that the jury resolved conflicting inferences in favor of the prosecution, the record established that the men discussed what to do with the victim in the field at the Sycamore house, which indicates that

41

1    they had not decided to kill her at the time Petitioner joined the others in the Pontiac on the

2    Westside and drove over to the Sycamore house. Given the doubly deferential review required

3    under <u>Jackson</u> and the AEDPA, the state court's determinations that the kidnapping was not

4    incidental to the murder and that Petitioner's participation in the discussion at the Sycamore

5    house aided the kidnapping were not objectively unreasonable.

6         The state court's decision denying Petitioner's sufficiency of evidence claim with respect

7    to the kidnapping conviction and special circumstance finding was not contrary to, or an

8    unreasonable application of, clearly established federal law, nor was it based on an unreasonable

9    determination of fact. The decision was not "so lacking in justification that there was an error

10   well understood and comprehended in existing law beyond any possibility for fairminded

11   disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, the Court finds that Petitioner is not

12   entitled to habeas relief on his third claim, and it should be denied.

13        4.  <u>Mayhem-Murder Special Circumstance</u>

14        Petitioner appears to assert there was insufficient evidence to support the mayhem-

15   murder special circumstance because there was no evidence of a specific intent to maim the

16   victim apart from the intent to kill. (ECF No. 1 at 44). Petitioner raised this claim on direct

17   appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a

18   reasoned decision. The California Supreme Court summarily denied Petitioner's petition for

19   review. As federal courts review the last reasoned state court opinion, the Court will "look

20   through" the California Supreme Court's summary denial and examine the decision of the

21   California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

22        In denying the sufficiency of evidence claim with respect to the mayhem-murder special

23   circumstance, the California Court of Appeal stated:

24        **C. Mayhem–Felony–Murder Special Circumstance**
          In order to support a felony-murder conviction and special circumstance for
25        mayhem-murder, the evidence must show the defendant had the specific intent to
          commit mayhem. (*People v. Campbell* (1987) 193 Cal.App.3d 1653, 1668.) A
26        person commits mayhem, as relevant here, when he or she willfully and
          maliciously disables or disfigures a member of another's body. (§ 203.)
27        Defendant argues there was no evidence he had the intent to disfigure the victim
          apart from his intent to kill and, therefore, his convictions must be reversed. We
28        disagree.

                                              42

The chosen method of killing the victim here was one that would both cause extreme pain and disfigurement should she survive. As we have already explained, there was evidence both that defendant sought to kill the victim to prevent there being any witnesses to the crime as well as to harm her for stealing the drugs. Defendant through his own admission counseled Cebrero to think twice before calling Reyes to get the drugs back from the victim because this was no "game." There was evidence the victim absconded with a pound of marijuana. Although defendant denied any ownership interest in the drugs, the jury could have rejected that self-serving testimony. Defendant's actions of inserting himself into the situation, by calling Reyes and then accompanying Cebrero to the car, joining the others at the Sycamore house, explaining the situation was "kind of bad" that the victim did not have the drugs, participating in the plan of burning the victim, and ultimately setting the victim on fire, all suggest he had some stake in the missing drugs.

The victim was taken to a remote field, doused with gasoline, and burned alive. While the evidence supported intent to kill, it likewise supported an intent to maim the victim. Indeed, the victim survived her injuries for some days. " '[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful,' and evidence that is sufficient to establish a defendant's intent to kill the victim can also be 'sufficient to establish the intent to permanently disable or disfigure that victim.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 89.)

*People v. Manibusan* is instructive. There, the codefendant shot the victim in the head from a distance of five to ten feet during the commission of an ineffectual robbery. Miraculously, the victim survived. In rejecting the claim the evidence was insufficient to support the intent to commit mayhem, the court explained, there was evidence the reason for the shooting was "something other than frustration resulting from an ineffectual robbery." (*People v. Manibusan, supra,* 58 Cal.4th at p. 89.) Rather, the evidence supported a finding the shooting was "a deliberate and calculated effort to silence her as a witness, either by killing her or by inflicting some other 'permanent disability'—such as brain damage—that would prevent her from identifying her assailants." (*Ibid.*; see *People v. D'Arcy* (2010) 48 Cal.4th 257, 297 [defendant's act of killing victim by dousing her with gasoline and lighting her on fire due to a belief she had withheld his money supported a finding defendant had concurrent intent to kill the victim as well as maim her]; *People v. Gonzales* (2011) 51 Cal.4th 894, 942–943 [mayhem-felony-murder conviction does not violate merger doctrine as mayhem-felony-murder has independent felonious purpose].)

Likewise here, as we have previously explained, the evidence supported a finding defendant harbored concurrent intents, both to kill the victim to silence any witness and to maim her as revenge for stealing the drugs. Evidence that they chose the method of burning the victim alive, they deliberated over that choice, and they were angry over the missing drugs all support the finding defendant harbored a concurrent intent to maim. Therefore defendant's claim must be rejected.

Ortega, 2014 WL 7152494, *25–26.

Here, the California Court of Appeal cited to People v. D'Arcy, 48 Cal. 4th 257, 297

(Cal. 2010), where the California Supreme Court found that a defendant's act of killing his

1  victim by dousing her with gasoline and lighting her on fire due to a belief she had withheld his

2  money supported a finding defendant had concurrent intent to kill the victim as well as to cause

3  her extreme pain and disfigurement by burning her. This determination is binding on this Court.

4  See Richey, 546 U.S. at 76 ("[A] state court's interpretation of state law, including one

5  announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

6  corpus."). Viewing the evidence in the light most favorable to the prosecution and presuming

7  that the jury resolved conflicting inferences in favor of the prosecution, the record established

8  that Petitioner lit the victim on fire due to a belief that she had taken a pound of marijuana from

9  Cebrero and Petitioner's brother. (4 CT 879, 914, 938–42). In light of D'Arcy, and given the

10 doubly deferential review required under Jackson and the AEDPA, the state court's

11 determination that Petitioner had concurrent intents to kill and maim the victim was not

12 objectively unreasonable.

13        5.  Torture-Murder Special Circumstance

14        Petitioner appears to assert that there was insufficient evidence to support the torture-

15 murder special circumstance because there was no evidence of a specific intent to maim the

16 victim apart from the intent to kill. (ECF No. 1 at 44). Petitioner raised this claim on direct

17 appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a

18 reasoned decision. The California Supreme Court summarily denied Petitioner's petition for

19 review. As federal courts review the last reasoned state court opinion, the Court will "look

20 through" the California Supreme Court's summary denial and examine the decision of the

21 California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

22        In denying the sufficiency of evidence claim with respect to the torture-murder special

23 circumstance, the California Court of Appeal stated:

   **D. The Evidence Was Sufficient to Support the Torture–Murder Special Circumstance**

24
25 Reiterating the same arguments, defendant claims the evidence was insufficient to
   support a finding he had an independent intent to torture the victim from his intent
26 to kill. He argues there "was no evidence that the method for the killing was
   selected for the independent purpose of either maiming [the victim] or inflicting
27 extreme and prolonged pain. These results were incidental to the plan to kill." We
   disagree.
28

44

Defendant was convicted of first degree murder as well as the torture-murder special circumstance. Defendant seems to assume the rule requiring the defendant to have an intent to commit the underlying felony independent of the murder before the felony special circumstance can be applied relates as well to the torture special circumstance. It does not.

The independent purpose rule articulated in *People v. Green* applies specifically to *felony-murder special circumstances.* Indeed, the rationale for the rule came from the statutory language, which at the time required the murder be perpetrated "during the commission of" an enumerated felony.[13] (*People v. Green, supra,* 27 Cal.3d at pp. 59–60.) Where the underlying offense is merely incidental to the murder, the murder could not be committed in the commission of the offense. Construing the language to allow the application of the special circumstance to a situation where the felony was incidental to the murder would be inconsistent with the "legislative purpose underlying the special circumstances—that of distinguishing between those murderers who deserve consideration for possible imposition of the death penalty from those who do not." (*People v. Williams* (1988) 44 Cal.3d 883, 927–928.)

Torture murder, however, is not listed as one of the felonies for the felony-murder special circumstance in section 190.2, subdivision (a)(17). Rather, the torture-murder special circumstance is governed by section 190.2, subdivision (a)(18): "The murder was intentional and involved the infliction of torture." Defendant has cited no authority, nor are we aware of any, that requires the torture be independent of the murder. As the plain language of the statute requires only that the murder "involved the infliction of torture," it is apparent the murder need not be independent of the torture.

Even were we to apply the rule defendant suggests, we would find defendant, at a minimum, had a concurrent intent to torture the victim. Defendant chose to kill the victim by lighting her on fire after she was doused with gasoline. Choosing such a painful method of killing the victim demonstrated defendant's intent to commit torture concurrently with the intent to kill.

To the extent defendant argues the evidence was insufficient to support the torture-murder conviction and torture-murder special circumstance, we reject the claim. Torture murder requires "a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain" (*People v. Steger* (1976) 16 Cal.3d 539, 546) for the calculated " 'purpose of revenge, extortion, persuasion or for any other sadistic purpose' " (*People v. Wiley* (1976) 18 Cal.3d 162, 168). "The jury may infer intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body." (*People v. Streeter* (2012) 54 Cal.4th 205, 245.)

In *People v. Streeter,* the Supreme Court found a torture-murder conviction and special circumstance was supported by the evidence where the defendant killed his girlfriend by burning her alive. The evidence established the two had a violent relationship and the victim took their children and left the defendant. The defendant convinced her to meet him with the children. Upon arrival, the defendant began leading one of the children away. The victim confronted him and

---

[13] The statutory language has been subsequently changed and now prohibits murder committed "while the defendant was engaged in, or was an accomplice in, the commission of" the enumerated felonies. (§ 190.2.) However, the rule that the crime must not be merely incidental to the murder remains. (See *People v. Clark* (2011) 52 Cal.4th 856, 947.)

a fight ensued where he beat her. He then retrieved a bottle filled with gasoline and poured gas on the victim's car and ultimately on the victim herself. He later dragged her to his vehicle where he lit her on fire. She subsequently died from her burns. (*People v. Streeter, supra,* 54 Cal.4th at pp. 211–215.)

The court found the evidence of the prior violent relationship, the fact the victim left with the children, and the defendant's prior threats against the victim and her family led to the reasonable inference the defendant intentionally set the victim on fire to cause her extreme pain to punish her or for revenge. (*People v. Streeter, supra,* 54 Cal.4th at p. 245.) The defendant's actions further demonstrated his intent to kill the victim, and in doing so, he inflicted torture. (*Id.* at p. 246.)

Likewise here there was evidence defendant participated in the planning of the murder, and defendant's act of lighting a stick and throwing it on the victim knowing she had been doused with gasoline supports the finding he intended to inflict extreme pain upon her. Defendant knew the victim had taken drugs from Cebrero, that Cebrero claimed she had done this before, that Reyes had been tasked to get the drugs back, and the drugs were never recovered. The jury was certainly entitled to infer defendant killed her in such a painful manner to punish her or to exact revenge for the theft of the drugs. There can be no question that dousing the victim in gasoline only to light her on fire and leave her in the middle of a field while the others fled would inflict severe suffering. (Accord, *People v. Martinez* (1952) 38 Cal.2d 556, 561 ["jury could reasonably conclude that when defendant set about to burn his wife with gasoline, his intention was to inflict cruel suffering as punishment or revenge on his victim"]; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201 [defendant's actions of brutally beating the victim then methodically pouring hot cooking oil over her body leaving numerous burns supported torture-murder conviction and torture-murder special circumstance].)

While the Supreme Court has "cautioned against giving undue weight to the severity of the victim's wounds, as horrible wounds may be as consistent with a killing in the heat of passion, in an 'explosion of violence,' as with intent to inflict cruel suffering" in determining whether the evidence supports a finding of torture, the evidence here amply supports the verdict. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1239.) Far from a situation indicating heat of passion or an explosion of violence, the evidence established a deliberate choice to kill the victim after discovering she did not have the drugs. The victim remained bound and held captive in the trunk of the car while the men discussed what to do. Then they obtained the gasoline, took her to the field, and set her on fire. The manner of the killing along with the surrounding circumstances supports a finding of intentional torture murder.

There was evidence from which the jury could infer defendant intended to kill the victim. Indeed, defendant admits as much in his brief. Defendant stated Cebrero said they should kill the victim. Defendant was seen talking to Cebrero and Valencia and was present when Valencia said he knew what to do with the victim, subsequently obtaining the bottle of gasoline. Defendant continued talking to Valencia and Cebrero for an additional 30 seconds after Valencia had obtained the gasoline. The jury could infer that given his admission that he knew Cebrero wanted to kill the victim, and Valencia had obtained the gas, the three were discussing the plan for the victim's demise. Immediately thereafter, defendant got into the vehicle with Valencia and Cebrero without hesitation. Defendant ultimately admitted that once they were in the field, and after the others placed the victim in the boat, either Valencia or Cebrero doused the victim with the gasoline. He knew they had obtained the gas and he could smell the substance. After the

others tried to light her and could not, defendant did so. Defendant, knowing the victim had been doused in gasoline, lit a stick on fire and threw it on the victim. It is reasonable to infer that lighting the victim on fire as a means to kill her was done with the intent to inflict extreme pain. The evidence established the victim suffered burns over 60 percent of her body and the injury would have been extremely painful. The victim survived for several days in this painful condition before she ultimately expired.

That the crime was committed for a sadistic purpose is also inferable from the record. Defendant knew the victim had taken the drugs and he assisted Cebrero by contacting Reyes to try to reacquire the contraband. Knowing the victim had been kidnapped, he joined Cebrero in the car where the victim was bound in the trunk. He participated in further planning regarding what to do with the victim, and he said the fact she did not have the drugs was "kind of bad." The jury was entitled to infer the victim was burned alive in revenge because she had crossed the others by taking the drugs. Choosing to kill her by burning her alive—because she had "done this too many times"—certainly qualifies as a sadistic purpose. Thus the torture-murder special circumstance was properly supported.

Ortega, 2014 WL 7152494, at *26–28 (footnote in original).

Here, the California Court of Appeal held that the torture-murder special circumstance was governed by California Penal Code section 190.2(a)(18), which provides, "The murder was intentional and involved the infliction of torture." The state court determined section 190.2(a)(18) does not require the torture to be independent of the murder. Ortega, 2014 WL 7152494, at *26. This interpretation is binding on this Court. See Richey, 546 U.S. at 76. Additionally, the California Court of Appeal applied California Supreme Court precedent, which provides that: (1) torture murder requires a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain for the calculated purpose of revenge, extortion, persuasion or for any other sadistic purpose; and (2) the jury may infer intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body. Ortega, 2014 WL 7152494, at *27 (citations omitted).

Viewing the evidence in the light most favorable to the prosecution and presuming that the jury resolved conflicting inferences in favor of the prosecution, the record established that: Petitioner was informed that the victim had taken a pound of marijuana from Cebrero and Petitioner's brother and that the victim had done this before; Petitioner participated in a discussion about the victim's fate after the marijuana was not recovered; and Petitioner lighted a stick and threw it on the victim with knowledge that she had been doused with gasoline. (4 CT

879, 894, 911, 940–42; 1 RT 166–69; 2 RT 294–98). Given the doubly deferential review required under Jackson and the AEDPA, the state court's determination that the jury reasonably inferred Petitioner killed the victim in such a painful manner to punish her or to exact revenge for the theft of the marijuana was not objectively unreasonable.

The state court's decision denying Petitioner's sufficiency of evidence claim with respect to the mayhem and torture special circumstance findings was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, the Court finds that Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

**D.  Ineffective Assistance of Counsel**

In his fifth claim for relief, Petitioner asserts that his trial counsel was ineffective for failing to subject the prosecution's case to meaningful adversarial testing, failing to investigate and conduct adequate pretrial preparation, and a general lack of diligence and competence during trial. Specifically, Petitioner alleges that trial counsel failed to: visit the crime scene, hire an investigator with experience in murder and kidnapping cases, interview defense witnesses, and hire any experts. (ECF No. 1 at 45–46). Respondent argues that Petitioner's ineffective assistance claim is unexhausted and conclusory, and that Petitioner cannot meet his burden under Strickland v. Washington, 466 U.S. 668 (1984). (ECF No. 13 at 50–51).

Pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (adopting the standard set forth in Granberry v. Greer, 481 U.S. 129, 135 (1987)). The Court need not determine whether Petitioner's ineffective assistance of counsel claim was properly exhausted because the Court finds that even under *de novo* review, the claim fails.

To success on an ineffective assistance of counsel claim, a petitioner must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the

48

1  defense." Strickland, 466 U.S. at 687. To establish deficient performance, a petitioner must

2  demonstrate that "counsel's representation fell below an objective standard of reasonableness"

3  and "that counsel made errors so serious that counsel was not functioning as the 'counsel'

4  guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of

5  counsel's performance is highly deferential. A court indulges a "strong presumption" that

6  counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687.

7  To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for

8  counsel's unprofessional errors, the result of the proceeding would have been different. A

9  reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at

10  694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The

11  likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at

12  111–12 (citing Strickland, 466 U.S. at 696, 693).

13       "[A] court need not determine whether counsel's performance was deficient before

14  examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it

15  is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,

16  which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

17  Here, Petitioner fails to submit any facts whatsoever demonstrating that "there is a reasonable

18  probability that . . . the result of the proceeding would have been different" if counsel had visited

19  the crime scene, hired experienced investigators and experts, and interviewed defense witnesses.

20  Strickland, 466 U.S. at 694. For example, Petitioner fails to state what favorable information

21  counsel could have gleaned from visiting the crime scene that was not presented at trial, what

22  possible information or evidence experienced investigators would have discovered that were not

23  otherwise uncovered by the investigators used by defense counsel, what testimony experts would

24  have offered at trial that would have assisted the defense, or the identity of the defense witnesses

25  and the nature of their testimony. Thus, the Court finds that Petitioner has not satisfied

26  Strickland's prejudice prong. As it is "perfectly clear" that Petitioner does not raise a colorable

27  ineffective assistance of counsel claim, the Court may deny the claim on the merits pursuant to

28  28 U.S.C. § 2254(b)(2).

### E.  Cumulative Error

In his sixth claim for relief, Petitioner asserts that the cumulative effect of the errors committed at trial violated his right to due process. (ECF No. 1 at 13). Respondent argues that this claim is unexhausted because it was not properly presented to the California Supreme Court, and in any event, none of the claims rise to the level of constitutional error. (ECF No. 13 at 52–53). Pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett, 406 F.3d at 624.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. . . . even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 298, 302–03, 290 n.3 (1973)). The Ninth Circuit has "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) (citing Parle, 505 F.3d at 933). For example in Parle, "all of the improperly excluded evidence . . . supported Parle's defense that he lacked the requisite state of mind for first-degree murder; at the same time, all of the erroneously admitted evidence . . . undermined Parle's defense and credibility and bolstered the State's case." Parle, 505 F.3d at 930.

Here, the Court has found that the state court's denials of Petitioner's five specific claims for habeas relief were not contrary to, or an unreasonable application of, clearly established federal law. There were no trial errors with respect to claims 1, 3, and 4. With respect to claims 2 and 5, the Court assumed error but found any error to be harmless. There is no "unique symmetry" of the trial errors assumed with respect to claims 2 and 5. The excluded third party culpability evidence would have demonstrated that Valencia had acted violently in the past and given additional support to the evidence already adduced at trial that others were the direct perpetrators of the kidnapping. Trial counsel's alleged failure to visit the crime scene, hire an

investigator with experience in murder and kidnapping cases, interview defense witnesses, and hire any experts does not amplify the third party culpability evidence in relation to a key contested issue because it was undisputed that Petitioner was absent when the victim was first abducted. As it is "perfectly clear" that Petitioner does not raise a colorable cumulative error claim, the Court may deny the claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

## V.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **November 7, 2016**              /s/ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE